USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-2061 HECTOR VEGA-RODRIGUEZ, ET AL., Plaintiffs, Appellants, v. PUERTO RICO TELEPHONE COMPANY, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Juan M. Perez-Gimenez, U.S. District Judge] ___________________ __________________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ __________________________ Rick Nemcik-Cruz, with whom Charles S. Hey-Maestre was on ________________ ______________________ brief, for appellants. Vannessa Ramirez, Assistant Solicitor General, Puerto Rico ________________ Dep't of Justice, with whom Carlos Lugo-Fiol, Solicitor General, ________________ Garcia & Fernandez, and John M. Garcia were on brief, for ____________________ ________________ appellees. __________________________ April 8, 1997 __________________________ SELYA, Circuit Judge. As employers gain access to SELYA, Circuit Judge. _____________ increasingly sophisticated technology, new legal issues seem destined to suffuse the workplace. This appeal raises such an issue. In it, plaintiffs-appellants Hector Vega-Rodriguez (Vega) and Amiut Reyes-Rosado (Reyes) revile the district court's determination that their employer, the Puerto Rico Telephone Company (PRTC), may monitor their work area by means of continuous video surveillance without offending the Constitution.1 Because the red flag of constitutional breach does not fly from these ramparts, we affirm. I. FACTUAL SURVEILLANCE I. FACTUAL SURVEILLANCE In conformity with accepted summary judgment protocol, we recount the undisputed facts in the light most congenial to the appellants and adopt their version of any contested facts which are material to our consideration of the issues. See, ___ e.g., Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. ____ _______ ________________ 1990). The Executive Communications Center (the Center) is located in the penthouse of the PRTC's office complex in Guaynabo, Puerto Rico. It maintains communication between the company's various operating units and the senior executive on duty, but it does not have primary corporate responsibility for  ____________________ 1To the extent that other parties are involved in this litigation for example, the plaintiffs' complaint identifies their wives and conjugal partnerships as additional plaintiffs and names two PRTC executives as codefendants their presence makes no discernible difference from an analytic standpoint. Consequently, we treat the case as if it involved only Vega, Reyes, and PRTC. 2 security and it does not house communication switching centers, cables, transmission lines, or kindred equipment. For security reasons, access to the Center is restricted; both the elevator foyer on the penthouse floor and the doors to the Center itself are inaccessible without a control card. PRTC employs Vega, Reyes, and others as attendants (known colloquially as "security operators") in the Center. They monitor computer banks to detect signals emanating from alarm systems at PRTC facilities throughout Puerto Rico, and they alert the appropriate authorities if an alarm sounds. Although individual employees work eight-hour shifts, the Center is staffed around the clock. The work space inside the Center consists of a large L- shaped area that contains the computers, the monitors, and assorted furniture (e.g., desks, chairs, consoles). The work space is completely open and no individual employee has an assigned office, cubicle, work station, or desk. PRTC installed a video surveillance system at the Center in 1990 but abandoned the project when employees groused. In June of 1994, the company reinstated video surveillance. Three cameras survey the work space, and a fourth tracks all traffic passing through the main entrance to the Center. None of them cover the rest area. The surveillance is exclusively visual; the cameras have no microphones or other immediate eavesdropping capability. Video surveillance operates all day, every day; the cameras implacably record every act undertaken in 3 the work area. A video monitor, a switcher unit, and a video recorder are located in the office of the Center's general manager, Daniel Rodriguez-Diaz, and the videotapes are stored there. PRTC has no written policy regulating any aspect of the video surveillance, but it is undisputed that no one can view either the monitor or the completed tapes without Rodriguez- Diaz's express permission. Soon after PRTC installed the surveillance system (claiming that it was desirable for security reasons), the appellants and several fellow employees protested. They asserted, among other things, that the system had no purpose other than to pry into employees' behavior. When management turned a deaf ear, the appellants filed suit in Puerto Rico's federal district court. They contended that the ongoing surveillance constitutes an unreasonable search prohibited by the Fourth Amendment, violates a constitutionally-conferred entitlement to privacy, and abridges rights secured by the First Amendment. After the parties had taken considerable discovery, PRTC moved for dismissal and/or summary judgment, and the individual defendants moved for summary judgment. The district court found merit in these submissions and entered judgment accordingly. The appellants then prosecuted this appeal. In the pages that follow, we deal first with a problem of how best to characterize the district court's ruling. We then address the appellants' illegal search and invasion of privacy claims. Because the appellants have neither briefed nor argued 4 their First Amendment claim in this venue, we deem it waived and do not pursue it. II. THE CHARACTERIZATION QUESTION II. THE CHARACTERIZATION QUESTION In an effort to put the characterization question into perspective, we trace the events leading up to the lower court's dispositive ruling. PRTC moved in the alternative for dismissal, Fed. R. Civ. P. 12(b)(6), or summary judgment, Fed. R. Civ. P. 56. In passing upon the motion, the district court employed the idiom of Rule 12(b)(6) (i.e., it said that it was dismissing the suit for failure to state a claim upon which relief might be granted), but the praxis of Rule 56 (i.e., it considered materials dehors the pleadings). It is imperative that we clarify these mixed signals; although these two rules share a certain family resemblance both are designed to cut short the litigation of cases that do not reach a threshold of trialworthiness they operate from different legal templates. We conclude that the district court's order ought to be tested against the summary judgment standard. We start from the text of Rule 12(b), which stipulates that if "matters outside the pleading are presented to and not excluded by the court," a motion brought under Rule 12(b)(6) "shall be treated as one for summary judgment and disposed of as provided in Rule 56." We have noted before that the proper approach to incipient conversion questions implicating these rules is functional, not mechanical. See Garita Hotel Ltd. ___ ___________________ 5 Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18-19 (1st ___________ ________________________ Cir. 1992) (stating the test as "whether the court actually took cognizance of [supplementary materials], or invoked Rule 56, in arriving at its decision"). Here, language in the district court's ruling indicates that it must have considered materials outside the pleadings. Thus, under the Garita Hotel test, conversion is proper. This ____________ circumstance militates strongly in favor of treating the lower court's decree as one granting summary judgment. Perhaps the only factor that tugs in a different direction is the district judge's choice of phrase but an appellate tribunal is not bound by the label that a district court attaches to its rulings. See, ___ e.g., Estate of Soler v. Rodriguez, 63 F.3d 45, 47 n.1 (1st Cir. ____ _______________ _________ 1995); cf. Cloutier v. Town of Epping, 714 F.2d 1184, 1188 (1st ___ ________ _______________ Cir. 1983) (affirming dismissal under the summary judgment standard although the lower court had dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) - (2)). We hasten to add that application of the summary judgment standard produces no perceptible unfairness. PRTC's motion invoked Rule 56 as one of two possible avenues for relief, and the dispositive motions filed by the individual defendants asked exclusively for summary judgment. The appellants responded to these motions in kind. By that time, there had been an adequate opportunity for discovery and the record was well- 6 developed.2 We therefore treat the challenged ruling as an order for summary judgment. Before ending this discussion, we pause to rehearse the summary judgment standard. Given the standard's familiarity, a lengthy exegesis is unnecessary. It suffices to say that we must undertake de novo review, construing all reasonable inferences from the evidence in the nonmoving party's favor. See ___ Garside, 895 F.2d at 48. Since the core purpose of summary _______ judgment is to "pierce the boilerplate of the pleadings" and examine the parties' proof to determine whether a trial actually is necessary, Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, _____ _________________________ 794 (1st Cir. 1992), the entry of summary judgment is appropriate if (and only if) no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. See id.; see also Fed. R. Civ. P. 56(c). In applying this ___ ___ ___ ____ formulation, a fact is "material" if it potentially affects the outcome of the case, and an issue is "genuine" if the probative evidence on it conflicts. See Garside, 895 F.2d at 48. ___ _______ III. THE FOURTH AMENDMENT III. THE FOURTH AMENDMENT PRTC is a quasi-public corporation. See P.R. Laws Ann. ___ tit. 27, 401-424 (1991). It is, therefore, a government  ____________________ 2To be sure, the appellants opposed summary judgment in part for want of an opportunity to depose PRTC's president, Agustin Garcia-Acevedo. But the appellants who conceded at oral argument in this court that it would not be unfair to scrutinize the district court's order under Rule 56 did not renew that objection on appeal. At any rate, given our ratio decidendi, it _____ _________ is difficult to imagine how this deposition, if taken, might shore up the appellants' case. 7 actor, see Kauffman v. PRTC, 841 F.2d 1169, 1170 (1st Cir. 1988); ___ ________ ____ Torres-Ponce v. Jimenez, 113 P.R. Dec. 58, translated in 13 P.R. ____________ _______ __________ __ Sup. Ct. Off'l Trans. 77, 91-93 (1982), subject to the suasion of the Fourth Amendment, see Buenrostro v. Collazo, 973 F.2d 39, 43 ___ __________ _______ (1st Cir. 1992). Building on this foundation, the appellants allege that PRTC's continuous video surveillance contravenes the "right of the people to be secure in their persons . . . against unreasonable searches." U.S. Const. amend. IV. We consider that allegation. A. Privacy Rights and the Fourth Amendment. A. Privacy Rights and the Fourth Amendment. _______________________________________ Intrusions upon personal privacy do not invariably implicate the Fourth Amendment. Rather, such intrusions cross the constitutional line only if the challenged conduct infringes upon some reasonable expectation of privacy. See Smith v. ___ _____ Maryland, 442 U.S. 735, 740 (1979).3 To qualify under this ________ mantra, a privacy expectation must meet both subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one which society recognizes as reasonable. See Oliver v. United States, ___ ______ _____________ 466 U.S. 170, 177 (1984); Smith, 442 U.S. at 740. Determining _____ the subjective component of the test requires only a straightforward inquiry into the complainant's state of mind, and, for purposes of this appeal, we are willing to assume arguendo that the appellants, as they profess, had some ________  ____________________ 3In this context, courts tend to use adjectives like "reasonable," "legitimate," or "justifiable" interchangeably. See Smith, 442 U.S. at 740. ___ _____ 8 subjective expectation of privacy while at work. We turn, then, to the objective reasonableness of the asserted expectation of privacy. In previous cases, the Supreme Court has answered this type of question by examining such diverse factors as the Framers' intent, the uses to which an individual has put a location, and society's understanding that certain areas (say, a person's home) deserve heightened protection from government intrusions. See Oliver, 466 U.S. at 178. But the Court has not ___ ______ developed a routinized checklist that is capable of being applied across the board, and each case therefore must be judged according to its own scenario. See, e.g., United States v. ___ ____ ______________ Mancini, 8 F.3d 104, 109 (1st Cir. 1993) (considering, inter _______ _____ alia, the totality of circumstances, the ability to regulate ____ access to particular premises, and the individual's status). With this in mind, we proceed by first surveying the legal principles that relate to searches of business premises and then narrowing our focus to the facts of this case and the appellants' asseverational array. B. Privacy Rights and Business Premises. B. Privacy Rights and Business Premises. ____________________________________ Generally speaking, business premises invite lesser privacy expectations than do residences. See G.M. Leasing Corp. ___ __________________ v. United States, 429 U.S. 338, 353 (1977); 1 Wayne R. LaFave, _____________ Search & Seizure 2.4(b) (3d ed. 1996). Still, deeply rooted ________________ societal expectations foster some cognizable privacy interests in business premises. See Oliver, 466 U.S. at 178 n.8; Mancusi v. ___ ______ _______ 9 DeForte, 392 U.S. 364, 367 (1968). The Fourth Amendment _______ protections that these expectations entail are versatile; they safeguard individuals not only against the government qua law ___ enforcer but also qua employer. See National Treasury Employees ___ ___ ___________________________ Union v. Von Raab, 489 U.S. 656, 665 (1989). _____ ________ The watershed case in this enclave of Fourth Amendment jurisprudence is O'Connor v. Ortega, 480 U.S. 709 (1987). ________ ______ O'Connor's central thesis is that a public employee sometimes may ________ enjoy a reasonable expectation of privacy in his or her workplace vis- -vis searches by a supervisor or other representative of a public employer. Withal, O'Connor recognized that "operational ________ realities of the workplace," such as actual office practices, procedures, or regulations, frequently may undermine employees' privacy expectations. Id. at 717 (plurality op.). The four ___ dissenting Justices shared this belief, see id. at 737 (Blackmun, ___ ___ J., dissenting), and subsequent case law confirms it, see, e.g., ___ ____ Von Raab, 489 U.S. at 669-72. In the last analysis, the ________ objective component of an employee's professed expectation of privacy must be assessed in the full context of the particular employment relation. See O'Connor, 480 U.S. at 717; Mancini, 8 ___ ________ _______ F.3d at 109. O'Connor is a typical case in which a public employee's ________ workplace-based privacy interests were vindicated. Dr. Ortega was on administrative leave from his post at a state hospital when hospital personnel, investigating misconduct charges, entered his office and removed personal items from his desk and 10 file cabinets. 480 U.S. at 712-13. The Court held that Dr. Ortega had a reasonable expectation of privacy in his desk and file cabinets because he did not share them with other workers, he used them to store personal materials, and the hospital had no policy discouraging employees from stashing personal items there. See id. at 718-19. Moreover, although the plurality eschewed the ___ ___ issue, a majority of the Justices believed that Dr. Ortega maintained a reasonable privacy expectation in his private office as well. See id. at 731-32 (Scalia, J., concurring); id. at 732 ___ ___ ___ (Blackmun, J., dissenting). Applying O'Connor in various work environments, lower ________ federal courts have inquired into matters such as whether the work area in question was given over to an employee's exclusive use, compare Thompson v. Johnson County Community Coll., 930 F. _______ ________ _______________________________ Supp. 501, 507 (D. Kan. 1996) (finding no reasonable expectation of privacy against video surveillance of an unenclosed locker area not sealed from view or provided for any employee's exclusive use) with United States v. Taketa, 923 F.2d 665, 673 ____ _____________ ______ (9th Cir. 1991) (finding a reasonable expectation of privacy against surreptitious video surveillance by DEA agents in an office reserved for the defendant's exclusive use), the extent to which others had access to the work space, see O'Bryan v. KTIV ___ _______ ____ Television, 868 F. Supp. 1146, 1159 (N.D. Iowa 1994) (finding no __________ reasonable expectation of privacy in an unlocked desk and credenza located in an "open, accessible area" of the station), the nature of the employment, see Sheppard v. Beerman, 18 F.3d ___ ________ _______ 11 147, 152 (2d Cir. 1994) (finding that a law clerk had no reasonable expectation of privacy in chambers' appurtenances, desks, file cabinets, or other work spaces due to the open access of documents between judges and clerks), and whether office regulations placed employees on notice that certain areas were subject to employer intrusions, compare Schowengerdt v. United _______ ____________ ______ States, 944 F.2d 483, 488 (9th Cir. 1991) (finding no reasonable ______ expectation of privacy in either office or locked credenza when engineer knew of security regimen, including daily office searches) and American Postal Workers Union v. United States ___ _______________________________ ______________ Postal Serv., 871 F.2d 556, 560-61 (6th Cir. 1989) (finding no _____________ reasonable expectation of privacy against search of employees' lockers when employer had promulgated regulations expressly authorizing random inspections in certain circumstances) with ____ Taketa, 923 F.2d at 672-73 (finding that unenforced regulations ______ did not defeat an otherwise reasonable expectation of privacy) and McGregor v. Greer, 748 F. Supp. 881, 888 (D.D.C. 1990) ___ ________ _____ (finding that public employee's own desk or office, normally not entered by co-workers or superiors, may engender a reasonable expectation of privacy in the absence of any policy or regulation warning otherwise). C. Privacy Interests in the Appellants' Workplace. C. Privacy Interests in the Appellants' Workplace. ______________________________________________ We begin with first principles. It is simply implausible to suggest that society would recognize as reasonable an employee's expectation of privacy against being viewed while toiling in the Center's open and undifferentiated work area. 12 PRTC did not provide the work station for the appellants' exclusive use, and its physical layout belies any expectation of privacy. Security operators do not occupy private offices or cubicles. They toil instead in a vast, undivided space a work area so patulous as to render a broadcast expectation of privacy unreasonable. See O'Connor, 480 U.S. at 717-18. ___ ________ The precise extent of an employee's expectation of privacy often turns on the nature of an intended intrusion. See ___ id. at 717-18; id. at 738 (Blackmun, J., dissenting). In this ___ ___ instance the nature of the intrusion strengthens the conclusion that no reasonable expectation of privacy attends the work area. Employers possess a legitimate interest in the efficient operation of the workplace, see id. at 723, and one attribute of ___ ___ this interest is that supervisors may monitor at will that which is in plain view within an open work area. Here, moreover, this attribute has a greater claim on our allegiance because the employer acted overtly in establishing the video surveillance: PRTC notified its work force in advance that video cameras would be installed and disclosed the cameras' field of vision.4 Hence,  ____________________ 4While this circumstance bears heavily on both the subjective and objective reasonableness of an employee's expectation of privacy, we do not mean to imply that an employer always can defeat an expectation of privacy by pre-announcing its intention to intrude into a specific area. See, e.g., Smith, 442 ___ ____ _____ U.S. at 740 n.5 (hypothesizing that "if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry," individuals still might entertain an actual expectation of privacy regarding their homes, papers, and effects); see also Heather L. Hanson, ___ ____ Note, The Fourth Amendment in the Workplace: Are We Really Being ___________________________________________________________ Reasonable?, 79 Va. L. Rev. 243, 250-52 (1993). In cases in ___________ which notice would contradict expectations that comport with 13 the affected workers were on clear notice from the outset that any movements they might make and any objects they might display within the work area would be exposed to the employer's sight. The appellants concede that, as a general matter, employees should expect to be under supervisors' watchful eyes while at work. But at some point, they argue, surveillance becomes unreasonable. In their estimation, when surveillance is electronic and, therefore, unremitting the camera, unlike the human eye, never blinks the die is cast. In constitutional terms, their theory reduces to the contention that the Fourth Amendment precludes management from observing electronically what it lawfully can see with the naked eye. This sort of argument has failed consistently under the plain view doctrine, and it musters no greater persuasiveness in the present context.5 See 1 ___ LaFave, supra, 2.7(f) (expressing skepticism about finding a _____ Fourth Amendment violation by fixed police video surveillance of a person's public activities). When all is said and done, employees must accept some circumscription of their liberty as a condition of continued employment. See INS v. Delgado, 466 U.S. ___ ___ _______ 210, 218 (1984). Once we put aside the appellants' theory that there is  ____________________ traditional Fourth Amendment freedoms, a normative inquiry is proper to determine whether the privacy expectation is nonetheless legitimate. See Hudson v. Palmer, 468 U.S. 517, 525 ___ ______ ______ n.7 (1984); Smith, 442 U.S. at 740 n.5. _____ 5We caution, however, that cases involving the covert use of clandestine cameras, or cases involving electronically-assisted eavesdropping, may be quite another story. 14 something constitutionally sinister about videotaping, their case crumbles. If there is constitutional parity between observations made with the naked eye and observations recorded by openly displayed video cameras that have no greater range, then objects or articles that an individual seeks to preserve as private may be constitutionally protected from such videotaping only if they are not located in plain view. See Taketa, 923 F.2d at 677. In ___ ______ other words, persons cannot reasonably maintain an expectation of privacy in that which they display openly. Justice Stewart stated the proposition in no uncertain terms three decades ago: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). Consequently, ____ _____________ no legitimate expectation of privacy exists in objects exposed to plain view as long as the viewer's presence at the vantage point is lawful. See Horton v. California, 496 U.S. 128, 133, 137 ___ ______ __________ (1990); Oliver, 466 U.S. at 179. And the mere fact that the ______ observation is accomplished by a video camera rather than the naked eye, and recorded on film rather than in a supervisor's memory, does not transmogrify a constitutionally innocent act into a constitutionally forbidden one.6 See 1 LaFave, supra,  ___ _____  ____________________ 6It is true, as the appellants repeatedly point out, that human observation is less implacable than video surveillance. But we can find no principled basis for assigning constitutional significance to that divagation. Both methods human observation and video surveillance perform the same function. Thus, videotaping per se does not alter the constitutional perspective in any material way.  15 2.7(f) (stating that individuals can record what is readily observable from a nonintrusive viewing area). The bottom line is that since PRTC could assign humans to monitor the work station continuously without constitutional insult, it could choose instead to carry out that lawful task by means of unconcealed video cameras not equipped with microphones, which record only what the human eye could observe. D. The Appellants' Other Fourth Amendment Arguments. D. The Appellants' Other Fourth Amendment Arguments. ________________________________________________ The appellants trot out a profusion of additional asseverations in their effort to convince us that continuous video surveillance of the workplace constitutes an impermissible search. First, invoking Orwellian imagery, they recite a catechism pasted together from bits and pieces of judicial pronouncements recognizing the intrusive nature of video surveillance. These statements are taken out of context. Without exception, they refer to cameras installed surreptitiously during the course of criminal investigations. See, e.g., United States v. Mesa-Rincon, 911 F.2d 1433, 1442 ___ ____ ______________ ___________ (10th Cir. 1990); United States v. Cuevas-Sanchez, 821 F.2d 248, _____________ ______________ 251 (5th Cir. 1987); Hawaii v. Bonnell, 856 P.2d 1265, 1276-77 ______ _______ (Haw. 1993). Concealed cameras which infringe upon the rights of criminal defendants raise troubling constitutional concerns  concerns not implicated by the employer's actions in this case. By like token, the appellants' attempts to analogize video monitoring to physical searches are unavailing. The silent video surveillance which occurs at the Center is less intrusive 16 than most physical searches conducted by employers. PRTC's stationary cameras do not pry behind closed office doors or into desks, drawers, file cabinets, or other enclosed spaces, but, rather, record only what is plainly visible on the surface. Sounds are not recorded; thus, the cameras do not eavesdrop on private conversations between employees. And while the Court occasionally has characterized the taking of pictures as a search, it is a constitutionally permissible activity if it does not transgress an objectively reasonable expectation of privacy. See, e.g., Dow Chem. Co. v. United States, 476 U.S. 227, 238-39 ___ ____ _____________ _____________ (1986) (upholding a search by aerial camera when the photographs taken were limited to the outline of the surveilled plant's buildings and equipment, even though the photos revealed more detail than could be seen by the human eye). Next, the appellants complain that while at work under the cameras' unrelenting eyes they cannot scratch, yawn, or perform any other movement in privacy. This complaint rings true, but it begs the question. "[T]he test of legitimacy is not whether a person chooses to conceal assertedly `private' activity," but whether the intrusion is objectively unreasonable. Oliver, 466 U.S. at 182-83; accord California v. Ciraolo, 476 ______ ______ __________ _______ U.S. 207, 212 (1986). Finally, the appellants tout the potential for future abuse, arguing, for example, that PRTC might expand video surveillance "into the restrooms." Certainly, such an extension would raise a serious constitutional question. See, e.g., People ___ ____ ______ 17 v. Dezek, 308 N.W.2d 652, 654-55 (Mich. Ct. App. 1981) (upholding _____ a reasonable expectation of privacy against video surveillance in restroom stalls). But present fears are often no more than horrible imaginings, and potential privacy invasions do not _________ constitute searches within the purview of the Fourth Amendment. See Dow Chem., 476 U.S. at 238 n.5; United States v. Karo, 468 ___ __________ _____________ ____ U.S. 705, 712 (1984). We have said enough on this score. The appellants have failed to demonstrate the existence of an issue of material fact sufficient to withstand summary judgment on their Fourth Amendment claim. Because they do not enjoy an objectively reasonable expectation of privacy against disclosed, soundless video surveillance while at work, they have no cause of action under the Fourth Amendment.7 IV. THE RIGHT OF PRIVACY IV. THE RIGHT OF PRIVACY In addition to their Fourth Amendment claim, the appellants contend that the Constitution spawns a general right, in the nature of a privacy right, to be free from video surveillance in the workplace.8 We do not agree. Although the Constitution creates no free-floating  ____________________ 7In light of this conclusion, we need not reach the question of whether the intrusion attributable to PRTC's video monitoring is reasonable under the circumstances. See O'Connor, 480 U.S. at ___ ________ 725-26. 8As presented in this proceeding, this claim necessarily rises or falls on principles of federal constitutional law. We are aware both that privacy interests are somewhat more zealously guarded by Puerto Rican norms, see, e.g., P.R. Const. art. II,  ___ ____ 1, 7, and that the appellants have a parallel suit pending in the local courts. 18 right to privacy, see Katz, 389 U.S. at 350-51, specific ___ ____ guarantees may create protectable zones of privacy. See Paul v. ___ ____ Davis, 424 U.S. 693, 712-13 (1976); Roe v. Wade, 410 U.S. 113, _____ ___ ____ 152-53 (1973). Thus, the appellants' privacy claim cannot prosper unless it is anchored in an enumerated constitutional guaranty. The Fourth Amendment obviously is unavailable for this purpose. See supra Part III(C) & (D). The appellants' effort to ___ _____ introduce the Ninth Amendment is similarly misdirected. The Ninth Amendment which stipulates that "the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people" does not create substantive rights beyond those conferred by governing law. See ___ Gibson v. Matthews, 926 F.2d 532, 537 (6th Cir. 1991); see also ______ ________ ___ ____ John E. Nowak & Ronald D. Rotunda, Constitutional Law 11.7 (5th __________________ ed. 1995) (observing that "the Ninth Amendment has not been used as the basis for defining rights of individuals") (collecting cases). The appellants' privacy claim thus hinges upon a right to privacy which has its origin in the Fourteenth Amendment's concept of personal liberty.9 Such privacy rights do exist, see ___ Roe, 410 U.S. at 152, but they have been limited to fundamental ___ rights that are implicit in the concept of an ordered liberty. See Paul, 424 U.S. at 713. On the facts of this case, the right ___ ____  ____________________ 9The Fourteenth Amendment guarantees, inter alia, that no _____ ____ state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, 1. 19 to be free from disclosed video surveillance while at work in an open, generally accessible area does not constitute a fundamental right. The courts have identified two clusters of personal privacy rights recognized by the Fourteenth Amendment. One bundle of rights relates to ensuring autonomy in making certain kinds of significant personal decisions; the other relates to ensuring the confidentiality of personal matters. See Whalen v. ___ ______ Roe, 429 U.S. 589, 598-600 (1977); Borucki v. Ryan, 827 F.2d 836, ___ _______ ____ 840 (1st Cir. 1987). PRTC's monitoring does not implicate any of these rights. The autonomy branch of the Fourteenth Amendment right to privacy is limited to decisions arising in the personal sphere matters relating to marriage, procreation, contraception, family relationships, child rearing, and the like. See Paul, 424 ___ ____ U.S. at 713; Griswold v. Connecticut, 381 U.S. 479, 485-86 ________ ___________ (1965). The type of privacy interest which arguably is threatened by workplace surveillance cannot be shoehorned into any of these categories. Because the appellants do not challenge a governmental restriction imposed upon decisionmaking in uniquely personal matters, they cannot bring their claim within the reach of the "autonomy" cases. The appellants' argument is no stronger under the confidentiality bough of the Fourteenth Amendment right to privacy. Even if the right of confidentiality has a range broader than that associated with the right to autonomy, but cf. ___ ___ 20 Borucki, 827 F.2d at 841-42 (suggesting that the right of _______ confidentiality protects only information relating to matters within the scope of the right to autonomy), that range has not extended beyond prohibiting profligate disclosure of medical, financial, and other intimately personal data. See id. at 841 ___ ___ n.8 & 842 (collecting cases). Any data disclosed through PRTC's video surveillance is qualitatively different, if for no other reason than that it has been revealed knowingly by the appellants to all observers (including the video cameras). This information cannot be characterized accurately as "personal" or "confidential." The appellants also appear to rely upon the substantive component of the Due Process Clause as a source of the envisioned privacy right. To this extent, they are whistling past the graveyard. The boundaries of substantive due process analysis are not sufficiently flexible to accommodate the appellants' claim. See, e.g., Paul, 424 U.S. at 713 (declining to enlarge ___ ____ ____ the scope of substantive due process to include a privacy interest in preventing publication of a person's arrest record); see generally Collins v. City of Harker Heights, 503 U.S. 115, ___ _________ _______ _______________________ 125 (1992) (expressing reluctance "to expand the concept of substantive due process"). Insofar as this claim invites a substantive due process analysis by purporting to challenge the existence of a rational relationship between PRTC's video surveillance and its legitimate needs qua employer, the claim is a non-starter. Even if we leave ___ 21 security concerns to one side,10 video surveillance is a rational means to advance the employer's legitimate, work-related interest in monitoring employee performance. See O'Connor, 480 U.S. at ___ ________ 724 ("[P]ublic employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner."); Alinovi v. Worcester Sch. Comm., 777 F.2d _______ ____________________ 776, 782 (1st Cir. 1985) (stating that an employee's privacy interest may be lessened due to a "supervisor's legitimate oversight responsibilities and the special duties that may be owed by the employee by virtue of his employment"). V. LEAVE TO AMEND V. LEAVE TO AMEND In a last-ditch effort to save the day, the appellants assert that the district court should have granted them leave to amend and that its failure to do so requires vacation of the judgment. The assertion is meritless. The short, dispositive answer to the appellants' plaint is that they never sought permission to amend in the court below. See Beaulieu v. United States IRS, 865 F.2d 1351, 1352 (1st Cir. ___ ________ _________________ 1989) ("[I]t is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal."). The slightly longer but equally dispositive answer is that where, as here, plaintiffs  ____________________ 10The appellants berate the district court for taking improper judicial notice of the Center's role in assisting law enforcement agencies authorized to perform wiretaps. Our review has been plenary, and whether PRTC coordinates wiretaps does not bear on our analysis. Accordingly, any error in this regard was harmless. 22 elect to stand upon their complaint and appeal from an adverse judgment, we have been exceedingly reluctant to direct the trial court to permit amendment upon affirmance of the judgment. See, ___ e.g., Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 23 (1st ____ ________________ _______________ Cir. 1989). Nothing in this case warrants a deviation from that sound praxis. The facts necessary to support the entry of judgment are undisputed and the appellants have not adverted to any additional facts which, if inserted into the record, could breathe new life into their moribund federal claims. Under such circumstances, leave to amend would be an empty exercise. See ___ Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. _______________ __________________ 1990); Dartmouth Review, 889 F.2d at 23. ________________ VI. CONCLUSION VI. CONCLUSION We need go no further. Because the appellants do not have an objectively reasonable expectation of privacy in the open areas of their workplace, the video surveillance conducted by their employer does not infract their federal constitutional rights. PRTC's employees may register their objections to the surveillance system with management, but they may not lean upon the Constitution for support. Affirmed. Affirmed. ________ 23