# United States Court of Appeals

## For the First Circuit

Nos. 08-1299, 08-1527, 08-1987

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE LARIOS, BENITO ROBLES, JULIO AGRON,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Gajarsa* and Lipez, Circuit Judges.

J. Hilary Billings for appellant Agron.
Oscar Cruz, Jr., Assistant Federal Public Defender, for appellant Robles.
Stephen Paul Maidman for appellant Larios.
Mark T. Quinlivan, Assistant United States Attorney, with whom Michael K. Loucks, Acting United States Attorney, was on brief, for appellee.

January 29, 2010

*Of the Federal Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**. Benito Robles, Jose Larios and Julio Agron (collectively, "appellants") were captured on audio/videotape participating in a controlled cocaine transaction in a motel room with an undercover agent. Robles and Larios entered guilty pleas to charges of conspiracy to distribute cocaine and possession of cocaine with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1), and, as to Robles, distribution of cocaine, 21 U.S.C. § 841(a)(1). They were each sentenced to 120 months in prison. Agron proceeded to trial and was convicted of conspiracy to distribute cocaine and possession of cocaine with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1), and was sentenced to a prison term of 168 months.

On appeal, Robles and Larios contend that the district court erred in admitting the audio recording at sentencing, because the unauthorized recording was obtained in violation of the federal wiretap statute, 18 U.S.C. §§ 2510-22 (enacted as Title III of the Omnibus Crime Control and Safe Streets Act) ("Title III"). Agron contends, on the same basis, that the court erroneously admitted the audio recording at trial. Appellants contend that they had a reasonable expectation of privacy in the motel room where the controlled transaction took place, and therefore the audio recording was an "oral communication" protected by Title III. The government argues that all three appellants lacked a legitimate expectation of privacy and therefore cannot invoke the protection

-2-

of Title III.  Alternatively, it argues that, as to Robles and Larios, the audio recording was admissible at sentencing as impeachment evidence.

The government's sweeping assertions as to the legality of the unauthorized, nonconsensual audio surveillance that took place here raise some difficult issues.  However, because of the particular facts of this case, we need not address the broader implications of the government's contentions.  As to Robles and Larios, who only challenge the admission of the audio recording at sentencing, we conclude that any error in admitting the recording was harmless, and therefore we do not address whether Robles and Larios had a reasonable expectation of privacy in the motel room. As to Agron, who challenges the admission of the audio recording at trial, we conclude that his brief engagement with the motel room did not justify a reasonable expectation of privacy in the room, and thus his communications were not protected by Title III.

## I.

### A. The Investigation

We draw the facts from the trial transcript and, where appropriate, the sentencing hearing transcripts.[1]

In late 2006, the Drug Enforcement Administration (DEA), together with state and local law enforcement agencies, initiated

---

[1] As noted, Agron proceeded to trial, while Robles and Larios entered guilty pleas and proceeded to sentencing.  Essentially the same facts were adduced at the trial and sentencing proceedings.

an investigation of cocaine trafficking in Worcester, Massachusetts. The investigation was triggered by a tip from a cooperating source that a drug trafficker in the area was selling kilogram quantities of cocaine.

On November 1, an undercover DEA agent purchased 125 grams of cocaine from Robles, the target of the investigation, and arranged to make future purchases of kilogram quantities of cocaine. On November 9, the undercover agent met with Robles and flashed him $100,000 in cash to prove the agent's ability to purchase large drug quantities. The undercover agent agreed to buy eleven kilograms of cocaine from Robles at a price of $21,500 per kilogram, and they planned for the transaction to take place the following day at a local Super 8 motel.

On November 10, DEA agents rented two rooms at the Super 8 motel in Leominster, Massachusetts. Without first obtaining a warrant, they installed a concealed audio/video recording device in Room 125, where the planned transaction would take place. From the second rented room across the hall, agents were able to conduct electronic surveillance of activities in Room 125 on an audio/video monitor and to observe the outside of Room 125 through the peephole in the door. After the rooms had been rented, the undercover agent met with Robles and gave him an electronic key to Room 125. Later that day, however, Robles informed the undercover agent that he

would not be able to deliver the cocaine until the following day, November 11.

Around 11 a.m. on November 11, Robles and two unidentified males entered Room 125. The men sat down, drank beer, and watched television for a few hours. At some point, Robles left the motel, and the two other men left sometime later. Around 2:00 p.m., Robles returned to Room 125 with Larios, but they were unable to enter the room because the key had been deactivated. The undercover agent met Robles in the motel parking lot about a half hour later, and Robles explained that his key was not working and he could not get into the room. The undercover agent took the key to the front desk, had it reactivated for an additional twenty-four-hour period, and returned the key to Robles. Robles and Larios then entered Room 125, first cautiously looking around to see if anyone else was in the room. Shortly thereafter, they left the motel.

Later that afternoon, Robles called the undercover agent and said he was ready to do the cocaine transaction. Around 5:30 p.m., Robles, Larios and Agron left Larios's home and got into a silver pick-up truck. One of the men carried a dark gym bag to the truck and threw it in the truck bed.[2] At around 6:00 p.m.,

---

[2] A law enforcement officer conducting surveillance outside Larios's home on the afternoon of November 11 observed appellants leave Larios's home and get into the silver pick-up truck. The surveilling officer could not identify, at that time, the individual carrying the dark gym bag.

-5-

appellants arrived at the Super 8 motel and parked beside a red pick-up truck registered to Robles and occupied by a fourth individual, Miguel Mayoral. Larios retrieved the gym bag from the truck bed, while Agron looked around the parking lot. An agent who conducted surveillance from the parking lot testified that Agron appeared to be conducting "countersurveillance," looking for any law enforcement officers in the area. Robles, Larios, and Agron entered Room 125, again first looking around to see whether anyone else was there. When they entered the room, Agron was carrying the gym bag, and he placed it at the foot of the bed.[3]

After learning from surveillance agents that Robles was accompanied by two other men, the undercover agent called Robles and informed him that he would not make the cocaine purchase if anyone else was there. Robles insisted that his cousin, Larios, be present, and the undercover agent agreed. The three appellants then had a discussion, and Robles said to Agron, "Keep your eyes peeled there, in case you see something strange, you talk to me or you talk to him . . . ." Agron then left the motel room, walked out to the parking lot, again looking around, and got into the parked red pick-up truck with Mayoral.

---

[3] DEA Agent Jamie Vitale, who conducted surveillance from the motel room on November 11, testified that he could not see who was carrying the gym bag through the peephole in the door. However, the video recording of the motel room showed that Agron was carrying the gym bag when appellants entered Room 125.

Once the undercover agent received notice that only Robles and Larios were present in Room 125, he entered the room, and Robles and Larios explained that they had only been able to obtain seven kilograms of cocaine, not the eleven kilograms originally agreed upon. The undercover agent inspected the seven kilograms of cocaine, which were in the gym bag on the bed. The undercover agent then gave an arrest signal, and agents arrested Larios and Robles in Room 125, and Agron and Mayoral in the motel parking lot. In a search incident to Agron's arrest, agents found a loaded nine millimeter handgun tucked into the waistband of his pants.

## B. District Court Proceedings

Following their arrests, appellants were indicted by a federal grand jury. The multi-count indictment charged all three appellants with conspiracy to distribute cocaine and possession of cocaine with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1), and further charged Robles with distribution of cocaine, 21 U.S.C. § 841(a)(1), and Agron with possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1). Robles and Larios pled guilty to the charges against them, while Agron proceeded to trial.

A central issue at the sentencing of both Robles and Larios was whether they were entitled to safety valve relief under 18 U.S.C. § 3553(f), which requires, inter alia, that the defendant

"truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan . . . ."  Id.; see also U.S.S.G. § 5c1.2(a)(5).  The government contended that Robles and Larios had not given complete and truthful proffers, because they had falsely stated in their safety valve debriefings that Agron had no involvement in the November 11 transaction.  The government sought to present evidence of Agron's involvement in the transaction, including a five-and-a-half to six minute segment of the audio/video recording of the motel room where the transaction occurred and a translated transcript of the audio recording.  The government also notified Agron of its intention to present this segment of the audio/video recording and the accompanying transcript at his upcoming trial.

At the outset of Larios's sentencing hearing, he objected to admission of the audio portion of the recording under the Fourth Amendment.  The court overruled his objection, correctly concluding that the exclusionary rule ordinarily does not bar the use of evidence obtained in violation of a defendant's Fourth Amendment rights in sentencing.  See United States v. Acosta, 303 F.3d 78, 86 (1st Cir. 2002) ("Given the great weight of the precedent and following the unanimous, reasoned approach of our sister circuits, we hold that the exclusionary rule does not bar the use of evidence seized in violation of a defendant's Fourth Amendment rights in

sentencing."); accord United States v. Stark, 499 F.3d 72, 80-81 (1st Cir. 2007).  After hearing testimony from law enforcement officers and viewing and listening to the audio/video recording, the court concluded that Larios was ineligible for safety valve relief because he failed to prove that he had made a complete and truthful proffer.  The court found that the evidence showed that Agron knowingly and willingly participated in the November 11 transaction:  he arrived at the motel with Robles and Larios, entered the motel room carrying the gym bag containing seven kilograms of cocaine, was asked to leave after the undercover agent insisted only two people be present, and then waited in the parking lot with a loaded, concealed firearm.  The court was "strongly influenced by the government's argument that someone doing a significant drug deal would not bring a random person to the deal, not a friend who had no involvement and was just there for the ride . . . ."  Larios was sentenced to the mandatory minimum 120-month term of imprisonment.

The following day, Robles filed a motion to exclude the audio/video recording at his own upcoming sentencing hearing, contending that the recording was inadmissible under Title III. Robles claimed that admission of the recording would violate 18 U.S.C. § 2515, which provides that wire or oral communications intercepted in violation of Title III may not be received into evidence in "any trial, hearing, or other proceeding in or before

any court. . . ." Robles relied solely on Title III, and did not contend that admission of the recording would violate his rights under the Fourth Amendment.[4]   That same day, Larios filed a motion to stay judgment and reopen his sentencing hearing, arguing that there were additional grounds for exclusion of the audio/video recording that had not been advanced at his sentencing hearing. Several days later, Agron filed a motion to suppress the audio/video recording at his upcoming trial, also relying solely on Title III.

The court granted Larios's motion to reopen his sentencing hearing and stay judgment, and set a briefing schedule on the issue of whether the audio/video recording was admissible under Title III.  The following month, Robles filed a memorandum in support of his motion to exclude evidence.  In that memorandum, he expressly disavowed making any Fourth Amendment claim, stating that he was "not raising any Fourth Amendment violation as the basis for suppression of the DVD recording at issue," and instead relied exclusively on Title III.  Larios and Agron moved to join in Robles's motion and supporting memorandum, which the district court allowed, and did not file separate memoranda in support of their motions.

---

[4] We surmise that Robles's reliance on Title III as the basis for his motion to exclude reflected an awareness that, as the district court had correctly concluded during Larios's sentencing hearing the previous day, the Fourth Amendment did not provide a basis for excluding the audio/video recording at sentencing.

-10-

After an evidentiary hearing and arguments from counsel, the district court denied Agron's motion to suppress and Robles's and Larios's motions to exclude evidence at sentencing in a ruling from the bench. First, the court concluded that appellants did not have an objectively reasonable expectation of privacy in the motel room under Minnesota v. Carter, 525 U.S. 83 (1998), and therefore the communications that appellants sought to exclude were not "oral communications" within the meaning of Title III. In support of its determination that appellants lacked a reasonable expectation of privacy, the court found that appellants were in the motel room only briefly for commercial purposes, the room was rented by law enforcement agents rather than appellants, and only one appellant, Robles, had a key to the room. Second, as an alternative ground for its ruling as to Robles and Larios, the court concluded that even if the audio/video recording was obtained in violation of Title III, it was admissible to impeach the truthfulness of Robles's and Larios's statements in their safety valve proffers.

Following its denial of appellants' motions, the court lifted the stay of judgment as to Larios and proceeded to Robles's sentencing. Based on findings similar to those made at Larios's sentencing hearing, the court concluded that Robles's proffer that Agron had no involvement in the November 11 transaction was not complete and truthful, and he was therefore ineligible for safety valve relief. The court reasoned that "someone doing a drug deal

-11-

would not bring a stranger or a friend along for the ride; and conversely, somebody going along for the ride would not be waiting in the parking lot with a gun." The court sentenced Robles to the mandatory minimum term of 120 months in prison.

After a three-day trial, a jury found Agron guilty of conspiracy to distribute cocaine and possession of cocaine with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1), but found him not guilty of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1). The court sentenced Agron to a prison term of 168 months.

These consolidated appeals followed.

## II.

### A. Safety Valve Relief for Robles and Larios

Robles and Larios contend that the district court erred in denying their motions to exclude the audio/video recording at sentencing, and ask that their cases be remanded for resentencing. They argue that they had an objectively reasonable expectation of privacy in their communications in the motel room, and therefore the intercepted statements were inadmissible "oral communications" within the meaning of Title III. They further contend that the recording was not properly admitted as impeachment evidence, because they did not testify at their sentencing hearings and therefore the impeachment exception to the exclusionary rule does not apply. However, we need not reach the issue of whether the

-12-

audio recording was properly admitted into evidence, either affirmatively or as impeachment evidence. As we explain below, the district court had ample evidence, independent of the challenged audio recording, from which to conclude that Robles and Larios had not given truthful proffers and were ineligible for safety valve relief. Therefore, any error in admission of the audio recording at sentencing was harmless.

Congress enacted the safety valve provision, 18 U.S.C. § 3553(f), in order to "mitigate the harsh effect of mandatory minimum sentences" for certain first-time, low-level offenders in drug-trafficking schemes. United States v. Padilla-Colón, 578 F.3d 23, 30 (1st Cir. 2009) (internal quotation marks and citation omitted). Under this provision, a court may impose a sentence below the statutory minimum for that offense if the defendant meets five requirements. 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. Here, only the fifth element is in dispute.[5] That element requires that

---

[5] The parties do not dispute that Robles and Larios satisfied the first four criteria for safety valve relief, which are:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in

-13-

not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(a)(5). A defendant who seeks the benefit of the safety valve bears the burden of proving, by a preponderance of the evidence, "that he has made truthful, complete, and timely disclosures to the government." United States v. Bermúdez, 407 F.3d 536, 542 (1st Cir. 2005); see also Padilla-Colón, 578 F.3d at 30. In making this showing, "nothing short of truthful and complete disclosure will suffice." Bermúdez, 407 F.3d at 542 (internal quotation marks and citations omitted).

Assuming, arguendo, that the district court erred in admitting the audio recording at sentencing, we review the proceeding below to determine whether Robles and Larios suffered prejudice because of the error. See Fed R. Crim. P. 52(a). We need not remand for resentencing if we conclude, "on the record as

the offense, as determined under the sentencing guidelines and was not engaged a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act. . . .

18 U.S.C. § 3553(f)(1)-(4); see also U.S.S.G. § 5C1.2(1)-(4).

-14-

a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed." Williams v. United States, 503 U.S. 193, 203 (1992).

As a preliminary matter, we note that regardless of whether the audio recording was admissible under Title III, the court could nevertheless consider the video recording in reaching its safety valve determination. At Larios's initial sentencing hearing, he objected to the admission of the audio/video recording on Fourth Amendment grounds, but the district court overruled that objection. Subsequently, all three appellants filed motions to bar admission of the audio/video recording, relying exclusively on Title III. Indeed, appellants expressly disavowed making any Fourth Amendment claim. Robles stated in his memorandum in support of the motion to exclude that he was "not raising any Fourth Amendment violation as the basis for suppression of the DVD recording at issue." Larios and Agron moved to join in Robles's motion and memorandum rather than filing separate memoranda in support of their motions.

By its terms, Title III regulates the interception and disclosure of "wire, oral, or electronic communication[s]." 18 U.S.C. § 2511. The statute defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Every circuit court to

address the issue has concluded that Title III does not regulate silent video surveillance.  See United States v. Falls, 34 F.3d 674, 679-80 (8th Cir. 1994); United States v. Koyomejian, 970 F.2d 536, 538 (9th Cir. 1992) (en banc); United States v. Mesa-Rincon, 911 F.2d 1433, 1436-37 (10th Cir. 1990); United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987); United States v. Biasucci, 786 F.2d 504, 508-09 (2d Cir. 1986); United States v. Torres, 751 F.2d 875, 880-81 (7th Cir. 1984).  Appellants make no argument and cite no authorities to the contrary.

We agree with our sister circuits that, by its plain meaning, the text of Title III does not apply to silent video surveillance.  See Koyomejian, 970 F.2d at 538-39; see also Biasucci, 786 F.2d at 508; Torres, 751 F.2d at 880.  Moreover, the legislative history of the statute and its more recent amendments indicate that Congress did not intend the statute to regulate video surveillance.  See Koyomejian, 970 F.2d at 539-40.  Thus, appellants' motions to exclude evidence under Title III challenged only the admission of the audio recording.[6]

---

[6] In addition, at the hearing on the motion to exclude evidence, counsel for Larios expressly conceded that the video portion of the recording was admissible and argued that the video recording was consistent with Larios's safety valve proffer. Defense counsel stated: "the video portion of the -- of the tape, which is admissible, I think, under -- because it's not the audio portion, I don't think speaks to somebody who was involved."

-16-

In this case, even without consideration of the challenged audio recording, the district court had more than sufficient evidence from which to conclude that Robles's and Larios's safety valve proffers were untruthful. Robles and Larios each asserted at their safety valve debriefings that Agron knew nothing about the November 11 transaction and was not involved in any way. At sentencing, appellants' proffers were contradicted by the testimony of three law enforcement agents who conducted surveillance on November 11, and by the video portion of the surveillance recording. The testimony and video recording demonstrated that on the evening of November 11, Agron arrived at the Super 8 motel with Robles and Larios. As Agron exited the truck, he looked around the parking lot, conducting what a surveilling law enforcement agent described as "countersurveillance." Agron carried a gym bag containing seven kilograms of cocaine into the motel room. After the undercover agent called Robles and insisted that no more than two people be present for the transaction, appellants had some kind of discussion. Agron then left the motel room and joined Mayoral in the parked red pick-up truck, again looking around the parking lot. At Agron's arrest shortly thereafter, agents found a loaded nine millimeter handgun concealed in his waistband.

This evidence amply supports the district court's conclusion that, contrary to Robles's and Larios's proffer, Agron

knowingly participated in the November 11 transaction. In making its determination, the district court reasonably inferred that participants engaged in a drug deal "would not bring a stranger or a friend along for the ride." See United States v. Azubike, 564 F.3d 59, 65 (1st Cir. 2009) ("[D]rug organizations do not usually take unnecessary risks by trusting critical transactions to outsiders." (quotation marks and citation omitted)). The court made the further reasonable inference that a mere bystander who was simply "going along for the ride" would not have waited in the parking lot with a concealed, loaded handgun. Although the audio portion of the recording was presented and considered by the court at sentencing, it was not necessary to the court's conclusion.[7] Even without consideration of the audio recording, the court had ample evidence from which to conclude that Robles and Larios did not make the "truthful and complete disclosure" required for safety valve relief. Bermúdez, 407 F.3d at 542. In light of these facts, we are satisfied that any error in the admission of the audio recording was harmless.

---

[7] Indeed, the only portion of the audio recording that appears relevant to the court's safety valve determination is Robles's statement to Agron to "Keep your eyes peeled there, in case you see something strange, you talk to me or you talk to him . . . ." Agron's own observable conduct indicated that he was at the scene to provide some kind of surveillance.

-18-

## B. Admission of Audio Recording at Agron's Trial

Unlike Robles and Larios, who challenge the introduction of the audio recording at sentencing, Agron challenges the admission of the recording at trial.  He contends that he had both a subjective and an objectively reasonable expectation of privacy in his communications in the motel room, and therefore the intercepted statements were "oral communications" as defined by 18 U.S.C. § 2510(2).  He argues that the audio recording, obtained without a warrant or his consent, was inadmissible under 18 U.S.C. § 2515, and requests that his conviction be vacated and his case remanded for a new trial.  We disagree, concluding that Agron's fleeting interaction with the motel room did not give rise to an objectively reasonable expectation of privacy, and therefore his statements were not "oral communications" governed by Title III.

We note that, in his brief on appeal, Agron appears to contend that the admission of the audio/video recording violated not only Title III but also the Fourth Amendment.  However, Agron did not make any Fourth Amendment claim in the district court.  As discussed above, Agron joined in Robles's motion and memorandum disavowing any Fourth Amendment claim and instead relying solely on Title III, which does not regulate silent video surveillance.

Therefore, we address only whether the audio recording was admissible under Title III.[8]

1. Legal Background

In evaluating the district court's denial of Agron's motion to suppress, we apply a mixed standard of review. We review "the court's findings of fact for clear error and the application of the law to those facts de novo." United States v. Vilches-Navarrete, 523 F.3d 1, 12 (1st Cir. 2008) (quotation marks and citation omitted). To succeed, Agron "must show that no reasonable view of the evidence supports the district court's decision." United States v. Dunbar, 553 F.3d 48, 55 (1st Cir. 2009) (quotation marks and citation omitted).

Title III governs the interception of wire, oral, and electronic communications by the government and private parties. See 18 U.S.C. § 2511. If a wire or oral communication has been intercepted in violation of Title III, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . ." 18 U.S.C. § 2515.

The statute defines "oral communication" as "any communication uttered by a person exhibiting an expectation that

_____

[8] Of course, silent video surveillance is subject to the Fourth Amendment, see, e.g., Torres, 751 F.2d at 882, and if Agron had raised a Fourth Amendment claim, he could have challenged the admission of the video recording. However, he made no Fourth Amendment claim in the district court.

-20-

such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). We have held that "[t]he legislative history of [this statutory provision] shows that Congress intended this definition to parallel the 'reasonable expectation of privacy test' articulated by the Supreme Court in Katz [v. United States, 389 U.S. 347 (1967)]." Dunbar, 553 F.3d at 57 (quotation marks and citation omitted). Thus, "for Title III to apply, the court must conclude: (1) the defendant had an actual, subjective expectation of privacy -- i.e., that his communications were not subject to interception; and (2) the defendant's expectation is one society would objectively consider reasonable." United States v. Longoria, 177 F.3d 1179, 1181-82 (10th Cir. 1999) (citing Katz, 389 U.S. at 361 (Harlan, J., concurring)).

In a single paragraph in his opening brief, Agron suggests that Congress intended the "reasonable expectation of privacy" analysis under Title III to conform to Fourth Amendment law as it existed when the statute was enacted in 1968, and not to evolve with later Fourth Amendment jurisprudence. This argument is unavailing. Agron points to no authority supporting the proposition that Congress intended the meaning of "oral communication" to freeze in 1968. Our prior decisions addressing whether statements are "oral communications" under Title III,

although not expressly addressing this contention, have relied on cases decided after 1968. See, e.g., Dunbar, 553 F.3d at 57.

We conclude that the most reasonable reading of the statute is that the meaning of "oral communication" was intended to parallel evolving Fourth Amendment jurisprudence on reasonable expectations of privacy in one's communications. As one district court opinion reasoned in rejecting an argument identical to Agron's, in enacting Title III Congress was "on clear notice of the dynamic quality of the law relating to the Fourth Amendment. . . . Thus, when Title III was enacted it was foreseeable that the law concerning the Fourth Amendment would continue to evolve." United States v. Salemme, 91 F. Supp. 2d 141, 394 (D. Mass. 1999), rev'd in part on other grounds, United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000). Therefore, we do not limit our analysis to the universe of cases that existed in 1968.

2. Analysis

In its denial of Agron's motion to suppress, the district court stated that it "assume[d] -- and no one seems to particularly dispute -- that the defendants, indeed, had a subjective expectation of privacy in the motel room." On appeal, the government states that it does not challenge the court's conclusion that appellants had a subjective expectation of privacy in the motel room. Therefore, we focus on whether Agron had an objectively reasonable expectation of privacy in his oral

communications in the motel room.  We do not need to, nor do we, address whether he had a reasonable expectation of privacy in not being filmed.

In denying Agron's motion to suppress, the district court reasoned that under Minnesota v. Carter, Agron had no objectively reasonable expectation of privacy in the motel room.  In Carter, a police officer looked through a gap in the closed blinds of an apartment and saw the lessee of the apartment bagging cocaine alongside the defendants, who were visiting the apartment for approximately two-and-a-half hours.  525 U.S. at 85-86.  The Court upheld the denial of the defendants' motion to suppress, concluding that the defendants, unlike an overnight house guest, had no legitimate expectation of privacy in the apartment.  The Court noted, inter alia, that the defendants were only present in the apartment for a few hours, they had no previous relationship with the apartment-lessee, and there was nothing suggesting the "degree of acceptance into the household" present in an overnight guest relationship.  Id. at 90-91; see also United States v. Rodríguez-Lozada, 558 F.3d 29, 37 (1st Cir. 2009) (holding that a defendant who was "a casual visitor for a brief period" in another person's apartment had no reasonable expectation of privacy in the apartment); United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998) (same).

-23-

Here, too, Agron's brief visit to the Super 8 motel room did not give rise to an objectively reasonable expectation of privacy in his communications in the room. Agron's interaction with the motel room was limited to a span of minutes. He entered the room for the first and only time at around 6:00 p.m. on the evening of November 11. His purpose in coming to the motel room was to conduct a brief transaction and then leave. He had not rented the room and did not have a key. Instead, he entered with Larios and Robles, who unlocked the door to the room. He left the room just a few minutes later, after the undercover agent called Robles and told him that he wanted no more than two people present for the drug transaction. Agron's fleeting visit to another person's motel room does not give him a privacy interest in his communications in the room.

Agron contends that in concluding that he lacked a reasonable expectation of privacy in the motel room, the district court failed to sufficiently consider the severity of the government's intrusion into his privacy.[9] He argues that even if he lacked a reasonable expectation of privacy from <u>physical</u>

---

[9] In its ruling, the district court did acknowledge that hidden audio/video surveillance was a particularly severe form of government intrusion.

-24-

<u>observation</u> in the motel room, he nevertheless had a reasonable expectation of privacy from surreptitious <u>audio surveillance</u>.[10]

We agree that, at least in theory, privacy interests in not being overheard may be greater than in not being seen, and vice versa, depending on the circumstances of the case. We have recognized that, as a general matter, whether an individual has a reasonable expectation of privacy may depend in part on the nature of the government intrusion. <u>See</u> <u>Vega-Rodríguez</u> v. <u>P.R. Tel. Co.</u>, 110 F.3d 174, 180 (1st Cir. 1997) ("The precise extent of an employee's expectation of privacy often turns on the nature of an intended intrusion."). However, the cases relied upon by Agron are clearly distinguishable. In <u>United States</u> v. <u>Nerber</u>, 222 F.3d 597 (9th Cir. 2000), a hidden video camera captured two defendants conducting a narcotics transaction with confidential informants in a hotel room rented by law enforcement agents. <u>Id.</u> at 599. After the informants left, the video camera recorded the motel room for the next three hours, as two additional defendants entered the room and the four defendants "brandished weapons and sampled cocaine." <u>Id.</u> The court held that "considering the totality of the circumstances of this case, including but not limited to the nature of the governmental intrusion," the defendants had a reasonable

---

[10] Agron describes the intrusion in this case as secret audio/video surveillance. However, as discussed above, Agron's motion to suppress was premised solely on Title III, which applies to audio surveillance, not silent video surveillance. Therefore, we address only the government's audio surveillance.

expectation that they would be free from video surveillance after the informants left.  Id. at 600, 604.[11]

In United States v. Padilla, 520 F.2d 526 (1st Cir. 1975), we held that secret audio surveillance of a motel room violated the defendant's reasonable expectation of privacy.  Id. at 528.  Law enforcement agents had rented a motel room for the defendant and installed a hidden microphone in his room.  Id. at 527.  The defendant stayed overnight in the room and used it as his "temporary residence" while in San Juan, Puerto Rico.  Id.  We concluded that when the defendant was left alone in his room, he had a justifiable expectation of privacy in his surroundings.  Id.

Agron's engagement with the motel room in this case was far more fleeting than that of the defendants in Nerber and Padilla.  Unlike the defendant in Padilla, he did not stay in the motel room overnight or use it as anything like a "temporary residence."  See id.  And unlike the Nerber defendants, he did not spend over three hours in the motel room, sampling drugs and interacting with his co-defendants.  See Nerber, 222 F.3d at 599.  Instead, Agron spent just minutes in the motel room before he was asked to leave.[12]  We conclude that, considering the totality of the

---

[11] In Nerber, the government conceded that audio surveillance conducted after the informants departed the motel room was inadmissible under Title III.  Id. at 604.  The government makes no such concession in this case.

[12] United States v. Ingram, No. 04-201-CR-1, 2005 WL 775930 (S.D. Ind. Mar. 25, 2005), a district court case that found the

-26-

circumstances, Agron had no reasonable expectation that he would be free from audio surveillance during his brief visit to another person's motel room.[13]

---

reasoning in Nerber persuasive, is also readily distinguishable. In Ingram, the court concluded that two defendants alone in a motel room rented by law enforcement agents had a reasonable expectation of privacy from secret video/audio surveillance. Id. at *6. The defendants arrived at the motel room in the night, spent five to seven hours there, two of them slept for several hours, and they "made themselves comfortable, ate, talked, relaxed, and generally settled in for a short but restful overnight stay." Id. at *4. The court held that, based on the defendants' engagement with the motel room and the severely intrusive nature of the audio/video surveillance, they had a reasonable expectation of privacy in the room. Id. at *6. In this case, Agron's few minutes in the motel room did not in any way resemble a "short but restful overnight stay."

[13] Agron also filed a pro se supplemental brief raising several claims that were not raised in the district court, and are therefore reviewed for plain error. United States v. Stepanian, 570 F.3d 51, 59 (1st Cir. 2009). We find no error. First, Agron contends that the government failed to establish that law enforcement agents rented the motel room where the drug transaction took place. However, law enforcement agent testimony demonstrated that the DEA rented two rooms at the Super 8 motel and gave the key for one of the rooms to Robles. Second, he argues that the criminal complaint against him was not supported by probable cause, noting that the complaint did not mention that the investigation began after DEA agents received a tip from a cooperating source. However, in an affidavit filed with the criminal complaint, Agent Vitale set forth the events leading up to Agron's arrest and noted that he was not providing an exhaustive list of all known facts related to the investigation. The magistrate judge did not err in finding probable cause based on this affidavit. Third, Agron argues that the prosecutor knowingly elicited false testimony at trial. He contends that Agent Vitale's testimony that the investigation began after the DEA received a tip from a cooperating source was false, because it was not included in Vitale's affidavit in support of the criminal complaint. As noted, however, Vitale's affidavit was not an exhaustive catalogue of every fact known to him about the investigation, and there is no indication that his testimony was false.

-27-

<u>Affirmed.</u>