FILED
United States Court of Appeals
Tenth Circuit

January 3, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

HAROLD R. WELLS,

        Defendant - Appellant.

No. 11-5162

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:10-CR-00116-BDB-1)**

---

William D. Lunn, Tulsa, Oklahoma, for Appellant.

Patrick C. Harris, Special Assistant U.S. Attorney (Eric H. Holder, Jr., Attorney General of the United States; Jane W. Duke and Patricia S. Harris, Special Assistant U.S. Attorneys, with him on the brief), Little Rock, Arkansas, for Appellee.

---

Before **HOLMES**, **MURPHY**, and **MATHESON**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

A grand jury charged Harold Wells and two others, all three officers of the Tulsa Police Department, with multiple offenses relating to the performance of their official duties. Following trial, a jury convicted Wells on two counts of violating federal drug laws and two counts of theft of government funds.[1] The other two defendants were acquitted on all counts. On appeal, Wells raises the following four challenges to his convictions: (1) the district court erred in ruling he had no expectation of privacy while conducting a consent-based search of a motel room outside the presence of the room's occupant; (2) the drug convictions are not supported by sufficient evidence; (3) the district court erred in excluding, as hearsay, certain audio recordings contained on a key fob; and (4) the district court erred when it denied his motion for a mistrial after a government witness testified about the possibility he had previously negotiated a plea deal with the government. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**.

---

[1]The jury found Wells guilty of one count of conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841, 846; one count of conspiracy to steal public funds, in violation of 18 U.S.C. § 371; one count of theft of more than $1000 of public funds, in violation of 18 U.S.C. §§ 2, 641; and one count of use of a communication facility to facilitate the commission of a drug felony, in violation of 21 U.S.C. § 843(b). The jury also found Wells guilty of one count of carrying a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c), but the district court granted Wells's motion for judgment of acquittal as to that count.

## II. BACKGROUND

Wells's prosecution began with a sting operation directed at Tulsa Police Department Officer J.J. Gray.[2] Cooperating witnesses told the FBI that Gray was engaging in illegal acts while performing his official duties. In particular, the FBI suspected Gray was stealing money and drugs from individuals he detained. FBI Special Agent Joe McDoulett adopted the persona of Mexican drug dealer Jason Lujan, an illegal alien going by the moniker "Joker."[3] After McDoulett rented a room at a Super 8 Motel, the FBI installed covert transmitting and recording equipment.[4] McDoulett received $13,620 in government funds to distribute around the room. He banded $10,000 of the cash into separate $1000 increments and placed it inside a Crown Royal bag in a drawer of a bedside table. He put the remaining $3620 under a pillow on the bed.

---

[2]This sting operation, which took place at a Super 8 Motel in Tulsa, occurred on May 18, 2009.

[3]The moniker "Joker" is used repeatedly throughout this opinion to refer to McDoulett. In particular, this opinion will generally use the "Joker" moniker when referring to actions taken by McDoulett while utilizing that persona.

[4]One camera with audio and video capability was concealed inside a bedside alarm clock (the "clock radio recording"). A second camera, which did not have audio capabilities, was concealed inside a floor lamp (the "floor lamp recording"). McDoulett also carried a key fob recorder that looked like a keyless entry device for a vehicle (the "key fob recordings"). The key fob recordings underlie Wells's third issue on appeal. *See infra* Section III.C. Additional factual and procedural background regarding the key fob recordings is set out below. *Id.*

After the room was ready, the FBI had a cooperating witness, Debra Clayton, inform Gray that a drug dealer with large quantities of drugs and cash was conducting business from a Super 8 Motel room.[5] Upon hearing from Clayton, Gray contacted Wells and told him a Hispanic drug dealer with a large quantity of methamphetamine was supposed to be at the Super 8 Motel. After surveilling the Super 8 Motel for some time, Wells and Gray contacted Clayton and instructed her to go to Joker's room. Clayton reported back to Gray and Wells that Joker had sold all his drugs.

The officers decided to conduct a knock and talk. Before they could do so, Joker was observed leaving his room and entering the hotel lobby. Tulsa Police Department Officer Eric Hill[6] detained and handcuffed Joker and placed him in a patrol car. While he was detained in this manner, Wells approached Joker and

---

[5]Gray testified that at the time of the events in question, he had known Clayton for a couple of years and she had been his confidential informant for a while.

[6]Hill testified at length at trial. After recounting the beginning of his career at the Tulsa Police Department, Hill testified as to his previous involvement with Wells, Gray, and others in the search of the house of a suspected drug dealer. Hill testified that during the search, officers discovered large quantities of drugs and cash. He further testified that, at the direction of Wells, he was given a portion of the cash seized from the house for his part in "doing a good job on the search." Hill testified to the circumstances leading up to his involvement in the events at the Super 8 Motel. Although Wells was not Hill's shift supervisor, Wells called Hill, told him about the information he had received about Joker, and told him to start his shift early. Hill testified this sequence of events was sufficiently irregular that it caused friction between him and his supervisor when the supervisor became aware of Hill's presence at the Super 8 Motel.

-4-

obtained consent for the officers to search Joker's motel room. Gray and Wells

went to Joker's room to conduct the search while Hill continued to detain Joker.

Much of their conduct in Joker's room was recorded by the floor lamp and clock

radio devices. The recordings, along with Gray's testimony, establish that Gray

and Wells stole $2000 from the room and allowed other officers to take an

additional amount of money.[7] This conduct underlies Wells's convictions for

conspiring to steal public funds, in violation of 18 U.S.C. § 371, and stealing

more than $1000 of public funds, in violation of 18 U.S.C. §§ 2, 641.

After the search was completed, Joker told Wells and Gray the details of

his purported drug operation. He said he brought five pounds of

methamphetamine to Tulsa and had sold all of it. Wells and Gray told Joker they

could charge him with methamphetamine possession, but would not arrest him if

he would set up some drug dealers in Tulsa. Joker's understanding of this

"arrangement" was that he was to bring an additional load of drugs to Tulsa in the

---

[7]The record indicates that after these discussions, Wells and Gray became suspicious when other Tulsa Police Department officers discovered a federal law enforcement agent in the vicinity. As a result, Gray and Wells recouped all the previously stolen monies. Although a highly contested issue at trial, the evidence indicates the officers then developed a cover story in the event they were the subjects of a federal sting operation. The officers indicated the story would be that the money was taken so it could be subjected to a sniff by a drug dog. All the funds were eventually turned in to the Tulsa Police Department. Nevertheless, Wells's police report omitted any reference to the presence at the scene of the other officers, including Gray, who initially took money from Joker's motel room.

future and was to allow Gray and Wells to arrest one of his multiple drug customers. As to the one individual who would be arrested, Gray and Wells would take the money that would ordinarily amount to Joker's profit. With respect to all other customers, Joker could conduct business "as usual" without law enforcement interference. Eventually Wells and Gray left Joker's room after a mere exchange of telephone numbers.

After the sting, Gray and Wells continued to have contact with Joker. For instance, in an initial effort to encourage further trips by Joker, and to keep an eye on Joker, Gray offered to set up Joker with a new buyer, Ryan Logsdon.[8] Gray and Wells were informed Joker and Logsdon met and engaged in drug

---

[8]McDoulett testified Gray told Joker he "could sell drugs to [Logsdon] free and clear of any law enforcement interaction and keep the profit" "because that would be [Joker's] way of being able to continue to sell in Tulsa." That is, according to McDoulett, "[i]t was [Gray's] way to encourage me to come back with a load." Gray testified as follows concerning his and Wells's motivations:

> Q. What was your purpose in [introducing Ryan Logsdon to Joker]?
>
> A. The purpose of that was if—we figured if it was a legitimate deal, that Joker could come back to town at any time without us knowing and continue to sell drugs and we would never know. So by introducing Logsdon to him, then we had an informant [keeping an eye on Joker], in hopes that if he did come to town without us knowing, that Ryan would be able to tell us and that we could bust him.

Gray was familiar with Logsdon because Logsdon was an informant for ATF Agent Brandon McFadden. Gray testified McFadden was corrupt and he and McFadden had engaged together in illegal acts.

transactions.[9]  For instance, Joker met Logsdon on July 2, 2009, in McAlester,

Oklahoma to sell Logsdon two ounces of methamphetamine.[10]  Gray and Wells

were aware a drug transaction took place on that date.  Eventually, Wells became

Joker's primary contact.  Gray continued to maintain contact with Logsdon and

advised Wells about Logsdon's activities with Joker.[11]

Eventually, as part of a second sting operation, the FBI introduced another

undercover agent as one of Joker's customers.[12]  Joker told Wells he had two

pounds of methamphetamine.  Wells agreed to allow Joker to sell a pound of

methamphetamine to Logsdon without law enforcement intervention.  In

exchange, Joker agreed to allow Wells to arrest the other purchaser (i.e., the new

undercover agent).[13]  Logsdon came to Joker's motel room at the Cherokee Inn

---

[9]Unbeknownst to Gray and Wells, Logsdon was also cooperating with the
FBI.  McDoulett knew Logsdon was working as an informant, but Logsdon did
not know Joker was merely a persona adopted by an FBI agent.

[10]Although this transaction did take place, the drugs were immediately
seized by federal agents because of Logsdon's status as an informant.

[11]Joker's contacts with Wells and Wells's contacts with Gray during this
time period were captured in an extensive series of wiretapped telephone calls.
For the purpose of resolving this appeal, it is unnecessary to summarize the
majority of these calls.  Instead, it is sufficient to state, as argued by the
government, that this evidence strongly corroborates the jury's guilty verdict as to
the drug conspiracy charge against Wells.

[12]This second sting operation occurred on July 29, 2009 at the Cherokee Inn
Casino.

[13]McDoulett testified that, acting as Joker, he told Wells the new

(continued...)

-7-

Casino for the purpose of consummating the planned transaction.[14] Joker called Gray to let him know he was meeting with Logsdon. Although Joker did not reach Gray, he left a voicemail for Gray telling Gray he did not have Wells's phone number and needed to "get a hold of [Wells] because I had his boy there with me." Shortly thereafter, Wells called Joker. In a recorded conversation, Joker informed Wells he was in town and had just finished a drug deal with Logsdon. Wells told Joker he would call him back and Joker said he would send Logsdon on his way.

When Wells called Joker, the two arranged to meet at a nearby restaurant. McDoulett recorded the meeting. The meeting focused on Joker's impending sale of a pound of methamphetamine to a customer Wells could arrest if he wanted. Wells asked Joker questions about the customer, such as whether he carried a weapon, what kind of car he would be driving, and where he was staying. Wells referred to Joker's drug activities as "my business" and expressed concern that he not cause problems for Joker with his supplier." Wells assured Joker that, if the customer was questioned, Wells would not ask the customer who his supplier was because doing so would compromise Joker. Wells and Joker agreed to summon

---

[13](...continued)
undercover agent was a regular customer, but one that traveled from Kansas to Tulsa to purchase drugs from Joker.

[14]Although a pound of methamphetamine changed hands in this transaction between Joker and Logsdon, Logsdon immediately delivered the drugs to the FBI upon leaving Joker's room.

the customer to Joker's motel room at approximately 7:00 p.m.  The "customer" (i.e., new undercover agent) arrived at Joker's motel room at 7:00 p.m. and the two simulated an attempted drug transaction.  After the customer left the room, Joker called Wells to explain the customer did not have enough money to buy the pound of methamphetamine and, consequently, the customer left the room with no drugs, but with a substantial amount of cash.  Wells asked Joker, "You got somebody else that can pick up that pound if we, if we don't sell this guy a pound?"  Joker said he could sell the pound of methamphetamine.[15]

Eventually, a federal grand jury returned a thirteen-count indictment charging Wells and other Tulsa Police Department officers with multiple counts of official corruption.  Following a jury trial, Wells was found guilty of conspiracy to possess with intent to distribute methamphetamine, conspiracy to steal public funds, theft of more than $1000 of public funds, and use of a communication facility to facilitate the commission of a drug felony.  *See supra* n.1.  Wells's codefendants were acquitted.  Wells appeals his convictions.

---

[15]This call between Joker and Wells appears to have taken place while the undercover agent/customer was being detained on the side of the road.  Wells told Joker he wanted to seize the cash found under the passenger side seat of the customer's car.  He indicated he would not do so, however, unless Joker could find a replacement customer for the pound of methamphetamine he continued to possess.

### III. ANALYSIS

#### A. Suppression Motion

##### 1. Background

Before trial, Wells filed a motion to suppress all audio and video recordings of activities in the Super 8 Motel room during any and all time periods when Joker was not in the room. *See United States v. Longoria*, 177 F.3d 1179, 1184 (10th Cir. 1999) (holding that while an informant who has consented to the recording is present, video and audio surveillance of a hotel room is not prohibited by either the Fourth Amendment or federal statute).[16] The district

---

[16]A federal statute, "Title III," regulates the interception and recording of audio communications, as well as the admissibility of such recordings into evidence in judicial proceedings. 18 U.S.C. §§ 2510 to 2520. No federal statute applies to video surveillance and recording. *United States v. Larios*, 593 F.3d 82, 90 (1st Cir. 2010). Instead, such surveillance is governed by the strictures of the Fourth Amendment. *United States v. Mesa-Rincon*, 911 F.2d 1433, 1437 (10th Cir. 1990). There is not, however, any material difference in analysis between Title III and the Fourth Amendment. Title III only applies to communications that are made while the speaker exhibits "an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). This court has construed that statutory phrase as providing a level of protection to oral communications equivalent to the protection generally provided by the Fourth Amendment. *United States v. Longoria*, 177 F.3d 1179, 1181-82 (10th Cir. 1999). In other words, if the speaker has no constitutionally reasonable expectation of privacy at the time the communication is made, the communication will not implicate Title III. Similarly, video surveillance will not run afoul of the Fourth Amendment if the individual whose actions are being recorded has no reasonable expectation of privacy at the time of the surveillance. *United States v. Nerber*, 222 F.3d 597, 604 (9th Cir. 2000). Thus, for purposes of this case, there is no difference in analysis between the audio surveillance and the video surveillance. The dispositive issue is whether Wells had a reasonable

(continued...)

-10-

court denied the motion. Because this court views the district court's analysis as cogent and persuasive, and because we largely adopt it as our own, we set it out in some detail. The district court began by summarizing the nature of the test for determining the existence of a reasonable expectation of privacy:

> Courts agree that an individual's reasonable expectation of privacy can vary depending on the nature of the government's conduct. [*See United States v. Larios*, 593 F.3d 82, 94 (1st Cir. 2010); *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000).] That is, the Fourth Amendment will be applied more strictly to protect individuals where the government utilizes more intrusive methods of performing searches. [*Larios*, 593 F.3d at 94; *Nerber*, 222 F.3d at 603.] Video and audio surveillance are highly intrusive forms of investigative mechanisms and, for that reason, have been subjected to a high level of scrutiny under the Fourth Amendment and the wiretap statute, with video surveillance deemed even more intrusive than audio "bugging." *See Nerber*, 222 F.3d at 603-05; [*United States v. Mesa-Rincon*, 911 F.2d 1433, 1442-43 (10th Cir. 1990)]. However, neither video nor audio surveillance automatically violates the Fourth Amendment; when such surveillance is conducted in a public place such as a bank, where no reasonable expectation of privacy exists, the surveillance is not subject to suppression. [*See United States v. Taketa*, 923 F.2d 665, 677 (9th Cir. 1991)]; *see also United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2000) (video surveillance of defendant's open field, where he had no reasonable expectation of privacy, did not violate Fourth Amendment). The Court will bear in mind this heightened level of protection against audio and especially video surveillance, in deciding the reasonable-expectation-of-privacy question.

> The test for determining whether a reasonable expectation of privacy exists for a particular Defendant in a particular location is two-fold: first, the defendant must establish that he "had an actual, subjective expectation of privacy—i.e., that his communications were

---

[16](...continued)
expectation of privacy in Joker's motel room when Joker was not present.

not subject to interception[.]" *Longoria*, 177 F.3d at 1181-82. Second, the defendant's expectation must be one "society would objectively consider reasonable." *Id.*

The Court accepts that Defendants had an actual or subjective expectation of privacy in the motel room while they were alone in the room. As evidenced by their alleged actions, they did not expect anyone to be conducting surveillance, and did not think anyone was observing them through any means, electronic or otherwise. The crucial issue in this case is whether Defendants' subjective expectation of privacy is one society would accept as objectively reasonable. . . .

District Ct. Order of May 12, 2011, Docket No. 174, at 4-5.

With this background in place, the district court moved on to consider the

relevant precedent in resolving this question:

Defendants' position finds most support in the case upon which they rely heavily, *United States v. Nerber* . . . . In *Nerber*, the Ninth Circuit determined that individuals who had come to a "bugged" hotel room, occupied by confidential informants, in order to consummate a drug transaction, had a reasonable expectation of privacy in the room once the confidential informants had left the premises. 222 F.3d at 604. The video surveillance tapes of the room were therefore suppressed for the entire period of time following the departure of the informants. In so holding, the Ninth Circuit acknowledged *Minnesota v. Carter*, 525 U.S. 83 (1998), in which the Supreme Court held that individuals in someone else's home, who were there for only a few hours and only to perform a commercial transaction, had no expectation of privacy in that home. [*Id.*] at 91. The Ninth Circuit, however, impliedly accepted the district court's (and defendants') argument that *Carter* was distinguishable because the government's method of investigation in *Carter*, peeking through a window, was purportedly much less intrusive than the video surveillance used by the government in *Nerber*.[1]

> [1]The Court uses the phrase "impliedly accepted" because the *Nerber* opinion does not address *Carter* at all in its discussion of the defendants' reasonable

-12-

expectation of privacy in the informants' hotel room. The only mention of *Carter* occurs in the section of the opinion holding that the severity of the government's intrusion can be considered in deciding whether a reasonable expectation of privacy exists. 222 F.3d at 600-01. However, the only possible basis *Nerber* could have had to distinguish *Carter* was to accept the district court's argument. Except for the nature of the government's investigative mechanism, the two cases are quite congruent with respect to their relevant facts. In both cases the defendants were in someone else's residence, temporary or otherwise; they were there for comparable periods of time; and they were there for the same commercial purpose, a drug transaction. *See Nerber*, . . . 222 F.3d at 606 (Gould, J., dissenting, and pointing out close similarity of facts in *Carter* and facts in *Nerber*).

There is a crucial difference between Defendants' position in this case and the position of the defendants in *Nerber*. In *Nerber* the defendants were guests invited into the hotel room by the informants, albeit for commercial purposes. They were there for a purpose that was ostensibly of benefit both to them and to the informants. In this case, on the other hand, Defendants obtained access to the room not as guests, but as law enforcement officers using the power of the state to obtain consent from the room's occupant. Defendants cannot be considered guests, either social or commercial, of their target, the undercover officer. This is an important point under Supreme Court jurisprudence. When an individual claims an expectation of privacy in someone else's residence, hotel room, or other premises, the Supreme Court has required that the individual demonstrate some type of societal recognition of the value of the individual's privacy rights in that particular situation. *See, e.g., Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (holding that an overnight guest in a residence had a reasonable expectation of privacy in that residence, because "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Id.*

The Supreme Court in *Minnesota v. Carter* . . . analyzed this requirement as a spectrum of privacy rights. 525 U.S. at 91. On one end of the spectrum are overnight guests, who are entitled to share in

the Fourth Amendment protection granted to individuals in their own homes, hotel rooms, etc. On the other end are individuals who are merely "legitimately on the premises"; such individuals have no expectation of privacy at all that society is prepared to recognize as reasonable. *Id.* Somewhere in between, according to *Carter*, are individuals who are on the premises at the invitation of the resident but are merely there to perform a commercial transaction. *Id.* Here, rather than being invited social or even commercial guests of the undercover officer, Defendants were merely "legitimately on the premises" of the undercover officer's motel room. Due to the intrusive nature of video surveillance, the *Nerber* court was able to stretch the expectation of privacy to cover commercial guests in a hotel room, despite *Carter*'s disparagement of such guests' privacy rights. Even under *Nerber*, however, the expectation of privacy cannot be stretched to the extreme end of *Carter*'s spectrum, to individuals who are not guests of any kind but are simply legally on the premises. This is true despite the intrusive nature of surreptitious audio and video surveillance.

Defendants also rely heavily on *Katz v. United States*, 389 U.S. 347 (1967). In *Katz* the Supreme Court held that electronically eavesdropping on a telephone call made from a public telephone booth violated the defendant's Fourth Amendment rights. *Katz* famously stated that "the Fourth Amendment protects people, not places" and added that what an individual "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." [389 U.S. at 351.] Defendants argue, in essence, that a motel room should be given just as much protection as a public telephone booth, and that warrantless video or audio surveillance of such a room should not be countenanced. However, a public telephone booth is different than a motel room that "belongs" to someone else, at least temporarily. Under societal norms, a public telephone booth belongs to no one individual until it is occupied by a person. At that point, the occupier is at least temporarily in sole control of the premises, in somewhat the same way a guest of a hotel is in sole control of his own room (with some limitations, of course, due to the rights of management to enter the room for various reasons). In that sense, the defendant in *Katz* was not occupying premises that legally "belonged" to a different individual. On the other hand, Defendants in this case did occupy someone else's premises, not their own. It makes sense that society would reject

-14-

their right to privacy in premises to which they had not been invited as guests and had no ownership or residence rights. In sum, there is a crucial difference between premises one is entitled to occupy at one's own initiative, and premises one may only occupy at the invitation or with the consent of another person.

The Court also recognizes that the Tenth Circuit has not been liberal in recognizing the privacy rights of individuals found in hotel rooms that were not rented in their names. The Tenth Circuit has insisted that such individuals present evidence establishing they are guests of the renter, rather than individuals merely present on the premises. *See, e.g., United States v. Rios*, [404 F. App'x 258 (10th Cir. 2010) (unpublished)] (defendant was found alone in locked motel room registered to someone else; this failed to demonstrate that he was an invited guest of the registered renter, and defendant therefore could not claim the protection of the Fourth Amendment); *United States v. Conway*, 73 F.3d 975, 979-80 (10th Cir. 1995) (individual found completely undressed in motel room, in possession of a key, had not demonstrated more than that he was merely in physical control and possession of the room; to be entitled to Fourth Amendment protections, individual had to demonstrate at minimum that he was an invited guest of the renter of the room). In addition, the Tenth Circuit has taken to heart the distinction in *Carter* between social guests and commercial guests. The Tenth Circuit, in line with *Carter*, grants little Fourth Amendment protection to individuals who are merely commercial guests. *See. e.g., United States v. Poe*, 556 F.3d 1113, 1121-22 (10th Cir. 2009) (individual who was social guest of resident had a reasonable expectation of privacy in resident's home because he demonstrated the requisite "degree of acceptance" into the household, unlike the commercial guests in *Carter*); *United States v. Rhiger*, 315 F.3d 1283, 1286 (10th Cir. 2003) (social guest had reasonable expectation of privacy in host's residence because such a guest has a degree of acceptance into the household that a commercial visitor does not).

The Tenth Circuit has thus denigrated commercial invitees' privacy rights in someone else's premises, and has emphasized a guest's degree of acceptance into a resident's household in deciding whether to recognize a reasonable expectation of privacy in someone else's premises. This indicates the Tenth Circuit would look askance at Defendants' claimed expectation of privacy in the undercover

-15-

officer's motel room, as they did not qualify as even commercial
guests and had absolutely no acceptance into the undercover officer's
"household."

*Id.* at 5-9 (footnotes omitted).[17]

## 2. Standard of Review

To prevail on his Fourth Amendment claim, Wells must demonstrate the

actions of the federal officials at issue here affected his individual constitutional

rights (or his rights under Title III). *United States v. Rhiger*, 315 F.3d 1283, 1285

(10th Cir. 2003). "To so demonstrate, . . . [he] must show that he had a

subjective expectation of privacy . . . and that society is prepared to recognize

that expectation as reasonable." *Id.* (quotation omitted). The existence of a

subjective expectation of privacy is a question of fact subject to review for clear

---

[17]In further support of its conclusion Wells did not have an objectively
reasonable expectation of privacy in Joker's motel room, the district court
reasoned that a contrary conclusion could lead to overreaching by government
officials. District Ct. Order of May 12, 2011, Docket No. 174, at 9-11; *id.* at 10-
11 ("Put another way, the purpose of the Fourth Amendment is to shield citizens
from overreaching by government officials. If law enforcement officers are
granted a reasonable expectation of privacy while they are carrying out searches
of citizens' property, and are thus not subject to surreptitious oversight, such
overreaching would be encouraged, or at least protected."); *see also id.* at 9
(cataloging cases in which courts have refused to recognize an expectation of
privacy because to do so would contravene societal interests). Wells vigorously
contests the district court's conclusion in this regard, spending the bulk of his
brief on appeal asserting he is not, by virtue of his profession as a police officer,
deprived of the protection of the Fourth Amendment. Appellant's Opening Br. at
35 (citing *United States v. McIntyre*, 582 F.2d 1221, 1224 (9th Cir. 1978)).
Because this court has no doubt that the proper resolution of this case is dictated
by the Supreme Court's decision in *Carter*, we need not rely on considerations of
public policy to resolve this appeal.

error.  *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988).  Whether any such subjective expectation of privacy is one society would consider reasonable, on the other hand, is subject to de novo review.  *Rhiger*, 315 F.3d at 1285.  We can resolve this appeal solely on the basis employed by the district court: any expectation Wells had that his communications inside Joker's motel room were private is not an expectation society would consider reasonable.  Accordingly, we do not take up the government's assertion that Wells did not have a subjective expectation of privacy in those communications.  *See United States v. Jefferson*, 925 F.2d 1242, 1249 n.3 (10th Cir. 1991) (utilizing same approach).

**3.  Analysis**

Wells's voluminous assertions on appeal can be boiled down to the following narrow proposition: the district court erred in its analysis when it focused on the location where Wells's speech took place, rather than on Wells's personal privacy expectations in the content of his conversations.  It is certainly true that "the Fourth Amendment protects people, not places."  *Katz*, 389 U.S. at 351.  "But the extent to which the Fourth Amendment protects people may depend upon where those people are."  *Carter*, 525 U.S. at 88.  The Supreme Court has specifically held that "capacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  *Id.* (quotation and

alteration omitted). Thus, the district court was quite correct to consider Wells's connection or, more appropriately, lack of connection, to Joker's motel room in evaluating Wells's suppression motion.

Like the district court, we conclude Wells's complete lack of socially meaningful connection to Joker's motel room renders objectively unreasonable any expectation of privacy he had in his communications and actions in that room. In that regard, this case closely resembles the First Circuit's decision in *Larios*. In *Larios*, the defendant, Julio Agron, challenged the admissibility of incriminating electronic surveillance evidence captured while he was visiting a motel room rented by an undercover agent. 593 F.3d at 84. As part of a sting operation, the government rented a motel room and installed audio and video recording equipment. *Id.* at 85. The government gave the target of the investigation, Benito Robles, a key to the room; Robles and the undercover agent planned for a large drug transaction to take place in the room. *Id.* Robles maintained possession of the room for two days. *Id.* at 85-86. On the second day, the date of the scheduled drug transaction, Robles was observed driving to the motel with Agron and a third individual. *Id.* at 86. Surveillance equipment in the room showed all three individuals enter, and specifically showed Agron place a dark gym bag at the foot of the bed. *Id.* Very shortly thereafter, the undercover agent called Robles to discuss the presence of the other individuals in the room. *Id.* Robles agreed to have Agron exit the room. *Id.* After Agron exited the room,

the agent entered the room and consummated the sting operation. *Id.* Prior to

trial, Agron moved to exclude the audio surveillance under Title III.[18] *Id.* at 91.

The trial court denied the motion and the First Circuit affirmed. *Id.* at 91, 93-95.

*Larios* concluded that one who is merely present in a motel room for a

period of a few minutes has no reasonable expectation that he will not be subject

to electronic surveillance. *Id.* at 93-94 (relying on the analytical path set out in

*Carter*). In so doing, it rejected arguments essentially identical to those made by

Wells in this case:

> In denying Agron's motion to suppress, the district court
> reasoned that under [*Carter*], Agron had no objectively reasonable
> expectation of privacy in the motel room. In *Carter*, a police officer
> looked through a gap in the closed blinds of an apartment and saw
> the lessee of the apartment bagging cocaine alongside the defendants,
> who were visiting the apartment for approximately two-and-a-half
> hours. 525 U.S. at 85–86. The Court upheld the denial of the
> defendants' motion to suppress, concluding that the defendants,
> unlike an overnight house guest, had no legitimate expectation of
> privacy in the apartment. The Court noted, inter alia, that the
> defendants were only present in the apartment for a few hours, they
> had no previous relationship with the apartment-lessee, and there was
> nothing suggesting the "degree of acceptance into the household"
> present in an overnight guest relationship. *Id.* at 90–91.
>
> Here, too, Agron's brief visit to the Super 8 motel room did
> not give rise to an objectively reasonable expectation of privacy in

---

[18]Unlike Agron, who proceeded to trial, Robles pleaded guilty. *Larios*, 593
F.3d at 84. Nevertheless, Robles challenged on appeal the admission at his
sentencing hearing of the recording from the motel room. *Id.* at 88. The First
Circuit declined to resolve whether Robles had an expectation of privacy in the
room because "any error in admission of the . . . recording at sentencing was
harmless." *Id.* at 89.

his communications in the room. Agron's interaction with the motel room was limited to a span of minutes. . . . His purpose in coming to the motel room was to conduct a brief transaction and then leave. He had not rented the room and did not have a key. Instead, he entered with Larios and Robles, who unlocked the door to the room. He left the room just a few minutes later, after the undercover agent called Robles and told him that he wanted no more than two people present for the drug transaction. Agron's fleeting visit to another person's motel room does not give him a privacy interest in his communications in the room.

Agron contends that in concluding that he lacked a reasonable expectation of privacy in the motel room, the district court failed to sufficiently consider the severity of the government's intrusion into his privacy. He argues that even if he lacked a reasonable expectation of privacy from *physical observation* in the motel room, he nevertheless had a reasonable expectation of privacy from surreptitious *audio surveillance*.

We agree that, at least in theory, privacy interests in not being overheard may be greater than in not being seen, and vice versa, depending on the circumstances of the case. We have recognized that, as a general matter, whether an individual has a reasonable expectation of privacy may depend in part on the nature of the government intrusion. However, the cases relied upon by Agron are clearly distinguishable. In [*Nerber*], a hidden video camera captured two defendants conducting a narcotics transaction with confidential informants in a hotel room rented by law enforcement agents. [222 F.3d at 599]. After the informants left, the video camera recorded the motel room for the next three hours, as two additional defendants entered the room and the four defendants "brandished weapons and sampled cocaine." *Id.* The court held that "considering the totality of the circumstances of this case, including but not limited to the nature of the governmental intrusion," the defendants had a reasonable expectation that they would be free from video surveillance after the informants left. *Id.* at 600, 604.

In *United States v. Padilla*, 520 F.2d 526 (1st Cir. 1975), we held that secret audio surveillance of a motel room violated the defendant's reasonable expectation of privacy. *Id.* at 528. Law enforcement agents had rented a motel room for the defendant and

installed a hidden microphone in his room.  *Id.* at 527.  The
defendant stayed overnight in the room and used it as his "temporary
residence" while in San Juan, Puerto Rico.  *Id.*  We concluded that
when the defendant was left alone in his room, he had a justifiable
expectation of privacy in his surroundings.  *Id.*

> Agron's engagement with the motel room in this case was far
more fleeting than that of the defendants in *Nerber* and *Padilla*.
Unlike the defendant in *Padilla*, he did not stay in the motel room
overnight or use it as anything like a "temporary residence."  *See id.*
And unlike the *Nerber* defendants, he did not spend over three hours
in the motel room, sampling drugs and interacting with his co-
defendants.  *See Nerber*, 222 F.3d at 599.  Instead, Agron spent just
minutes in the motel room before he was asked to leave.  We
conclude that, considering the totality of the circumstances, Agron
had no reasonable expectation that he would be free from audio
surveillance during his brief visit to another person's motel room.

*Id.* at 93-95 (citations and footnotes omitted).

Like the defendant in *Larios*, Wells had no socially meaningful connection

to the motel room at issue.  The record reveals that after obtaining Joker's consent

to enter the room, he spent approximately fifteen minutes in the room outside

Joker's presence.  Thus, Wells was merely legally present in the room for a very

limited amount of time.  Wells cannot point to any decision supporting the

existence of an objectively reasonable expectation of privacy in such

circumstances.[19]

_____

[19]For those reasons identified by the district court, District Ct. Order of
May 12, 2011, Docket No. 174, at 6, and the *Larios* court, 593 F.3d at 94, this
court concludes the Ninth Circuit's decision in *Nerber* is entirely distinguishable.
That is, the commercial relationship between the parties in *Nerber* creates at least
some kind of socially relevant connection between the defendant and the motel
(continued...)

-21-

Nor does this court think the heightened scrutiny applicable to audio and video surveillance is, standing alone, enough to carry the day for Wells. *See Mesa-Rincon*, 911 F.2d at 1442-43 (recognizing propriety of applying heightened scrutiny to comparatively more intrusive forms of electronic surveillance). Like the court in *Larios*, we conclude the absence of any socially meaningful connection to the motel room at issue renders any expectation of privacy unreasonable, even in the face of video and audio surveillance. To rule otherwise would set this court at odds with the Supreme Court's admonition that it is necessary to factor into the expectation-of-privacy analysis a defendant's connection to the place invaded. *Carter*, 525 U.S. at 88. Further, as far as this court can tell, to rule for Wells we would have to set forth a rule of exclusion as to electronic surveillance without any relevant limiting principle. That is, under the analysis advanced by Wells, it should be improper for the government to undertake electronic surveillance in any place a defendant intends for his communications to be private (i.e., a purely personal-rights-based analysis of electronic surveillance). The logical extension of such elevation of a defendant's

---

[19](...continued)
room. 222 F.3d at 599. Furthermore, after the confidential informant left the room, the defendant in *Nerber* spent over three unsupervised hours in the room interacting with his codefendants. *Id.* Given these ready distinctions, this court concludes *Nerber* has little meaningful to say about the facts in this case. For that reason, it is unnecessary for this court to offer up an opinion on whether *Nerber* was correctly decided.

subjective expectation would be to eliminate the historic focus on the objective reasonableness of such expectations vis-a-vis the place invaded and threaten the admissibility of electronic recordings captured in public venues, such as airports, banks, and shopping malls. This court declines Wells's invitaton to eliminate the Fourth Amendment touchstone of "the invaded place" from our analysis of whether any particular defendant has an objectively reasonable expectation of privacy in a given communication.

For those reasons set out by the district court and those reasons set out above, this court concludes Wells did not have a reasonable expectation of privacy in any of his communications in Joker's motel room outside of Joker's presence. The district court, therefore, correctly denied Wells's motion to suppress.

## B. Sufficiency of the Evidence

Wells makes the following three broad challenges to the sufficiency of the evidence supporting his drug convictions: (1) what transpired between him, Gray, and Joker was not criminal conduct but was, instead, legitimate law enforcement activity; (2) even if the activity was not legitimate law enforcement activity, Gray and Wells were not parties to the conspiracy at the same time; and (3) the government failed to prove the parties were interdependent.

### 1.  Standard of Review

"We review the sufficiency of the evidence to support a conviction or the denial of a defendant's motion for judgment of acquittal de novo." *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (alteration and quotation omitted). Nevertheless, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).  As such, in addressing a sufficiency challenge, this court must "take the evidence—both direct and circumstantial, and reasonable inferences drawn from that evidence—in the light most favorable to the government and ask only whether a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Rufai*, 732 F.3d at 1188 (alterations and quotations omitted).  Furthermore, this court "many not weigh evidence or consider credibility of witnesses." *Id.* (quotation omitted).

### 2.  Analysis

#### a. Legitimate Law Enforcement Activity

Wells asserts the evidence as to his efforts to encourage Joker to sell methamphetamine in Tulsa was insufficient to support his drug-based convictions. Instead, according to Wells, the evidence presented at trial is perfectly consistent with legitimate police conduct.  Like the district court, we conclude this claim is meritless.

In rejecting Wells's request for judgment of acquittal, the district court considered this exact argument. In concluding the jury was not obligated, as a matter of law, to find Wells's actions were consistent with legitimate police conduct, the district court ruled as follows:

> [Wells's] final argument is that he was merely engaged in legitimate law enforcement activities by agreeing to overlook certain drug transactions in order to attain a more important objective. He points out that the Tenth Circuit has specifically stated that law enforcement officers must be given leeway to complete several transactions with a suspect, in order to "probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy." *United States v. Scull*, 321 F.3d 1270, 1277 (10th Cir. 2003). This is a legitimate argument, and one that [Wells] was able to make to the jury.[20] The jury, however, rejected it, and there was evidence supporting the jury's decision. This evidence included wiretaps indicating [Wells] had no plans to trace Joker's suppliers, to use Joker for any "larger" purpose, or to arrest Joker at the end of a series of transactions. Instead, there was evidence [Wells] and Gray agreed with Joker to facilitate Joker's sale of methamphetamine in Tulsa, allowing certain of his customers to walk off with a substantial amount of methamphetamine while they arrested only one and allowed Joker to leave with his proceeds. Viewing the evidence in the light most favorable to the Government, the jury could determine that Gray and [Wells] agreed to help Joker, a major supplier of methamphetamine, to operate in Tulsa while arresting only a more minor player, one of his customers. This is not an

---

[20]In his closing argument, Wells argued as follows:

Harold Wells was trying to do his job. And if this guy is bringing dope into Tulsa, Oklahoma, he wants to stop him. . . . This guy says he's moving five to ten pounds. You need to know where that's coming from, you need to know how it's there, but you've got to do it slowly. You can't come up and say, "Hey, where are you getting all this dope? We want to arrest you."

example of legitimate law enforcement activity. *See, e.g.*, [*United States*] *v. Ohlson*, 552 F.2d 1347 (9th Cir. 1977) (upholding conspiracy conviction on very similar facts).

District Ct. Order of Aug. 23, 2011, Docket No. 271, at 4-5.

Having reviewed the entire record, this court has no difficulty concluding there is sufficient evidence in the record to support the jury's finding that Wells was not engaging in legitimate police practices but was, instead, engaging in a criminal conspiracy. In addition to the cogent analysis set out by the district court, we note that Wells has not challenged the sufficiency of the evidence supporting his convictions for conspiring to and stealing government funds. As set out in the indictment, the basis for these charges was the theft of cash from Joker's room at the Super 8 Motel. The evidence surrounding the theft of those funds surely provided the jury a sufficient basis to infer that Wells's and Gray's motivation in developing a relationship with Joker was to maintain a steady supply of drug dealers from which they could potentially steal cash and drugs.[21] As further support for this inference, Wells and Gray told Joker they could charge him with possession of methamphetamine, but would forbear if Joker agreed to

---

[21]In that same vein, Gray testified that after the cash was stolen from Joker's room, the conspirators became fearful they were being set up when a federal agent was stopped in a parking lot close to the Super 8 Motel. In response, the conspirators returned the stolen money and concocted a story that it had been parceled out so it could be taken to a drug dog to see if the dog would alert. Both the fear of being entwined in a federal sting operation and the development of a false cover story are highly indicative of consciousness of guilt.

set up drug dealers in the Tulsa area. McDoulett's understanding of this "arrangement" was that he was to bring an additional load of drugs to Tulsa in the future and then allow Gray and Wells to arrest one, and only one, of his multiple customers. As to all other customers, Joker could conduct "business"[22] as usual without law enforcement interference. In this regard, McDoulett testified as follows about a discussion that took place while only Gray and Wells were present in the motel room with him:

> Q. Do Wells and Gray discuss with you the possibility of criminal charges being filed against you?

> A. Yes, they tell me that I will be charged with possession of narcotics and possession of drug proceeds based on the residue that they found in the Crown Royal bag.

> Q. Did [they] tell you about a way you could get out of being charged with criminal conduct?

> A. Yes. That was the conversation where they discussed me cooperating with them by bringing up another load of methamphetamine from Dallas to Tulsa. . . .

> Q. Okay. And what did you understand your responsibility would be if you accepted this arrangement to bring a load back to Tulsa, what was going to happen?

> A. That I would bring my load to Tulsa and allow the—Officer Gray and Officer Wells to arrest one of the people that would buy methamphetamine from me.

---

[22]Wiretap evidence admitted at trial demonstrate Gray and Wells planned to permit Joker to continue trafficking and selling drugs without fear of intervention because it was his "livelihood"; they repeatedly referred to the drug endeavor as "business."

Q.  Just one of the people?

A.  That was my understanding.

Q.  Were there going to be additional people that you would have sold to, though?

A.  Absolutely.

Q.  So the nature of your agreement with them was that you would come back to Tulsa, bring a load of methamphetamine, and allow them to arrest one of your multiple customers, correct?

A.  That's correct.

Q.  And with respect to the other customers that weren't arrested, what was your understanding of your arrangement with Officers Wells and Gray that night?

A.  That I could conduct business as usual.

Q.  What did "conduct business as usual" mean?

A.  Arrange to sell whatever amount the client would usually purchase from me.

Q.  What about the money generated from the sale of those drugs to the other customers?

A.  That would not be involved in the arrest of the other individual.  The other individual, the person would be arrested, obviously with drugs, and I would not be able to profit from that transaction.  They would take my profit.

Furthermore, Wells and Gray actively advised Joker on how best to traffic drugs and avoid arrest.  All the while, neither Wells nor Gray ever alerted anyone at the Tulsa Police Department or the Tulsa County District Attorney's Office that they

were using Joker in an official capacity as a confidential informant.[23]  On these facts, a rational basis clearly exists for the jury's guilty verdicts as to the drug charges.  After all, "[t]he evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.  Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt."  *United States v. Davis*, 437 F.3d 989, 993 (10th Cir. 2006) (quotations omitted).

### b. Bifurcation of Conspiracy

Wells asserts the evidence shows he only conspired with, if anyone, Joker. That is, Wells asserts the evidence establishes two distinct conspiracies existed: one between Joker and Gray that lasted until July 10, 2009, and a second between Joker and Wells that commenced shortly thereafter.  Because one cannot conspire solely with government informants or agents, *United States v. Barboa*, 777 F.2d 1420, 1422 (10th Cir. 1985), Wells asserts his conspiracy conviction must be

---

[23]Wells contests this point, arguing he spoke about Joker to Officer Mike Parsons on July 29, 2009.  As noted by the government, however, Wells's interactions with Parsons are highly unusual.  In fact, a fair reading of the wiretap evidence reveals Wells contacted Parsons solely for the purpose of eliciting Parsons's aid in detaining Jokers's second customer during the Cherokee Inn Casino sting.  In a wiretapped call between Wells and Gray, Wells indicated he regretted involving Parsons because Parsons wanted to arrest Joker and Wells had to actively dissuade Parsons from doing so.  Although Wells argues his actions in this regard amount to a legitimate judgment call as to how best to deal with his confidential informant, the utter absence of record evidence showing Wells and Gray had a plan to use Joker for a higher purpose allowed the jury to reasonably conclude Wells's actions were not legitimate.

reversed. Wells's contention in this regard does not stand up to an examination of the trial record.

Although their respective levels of personal interaction with Joker ebbed and flowed over the course of the conspiracy, a rational juror could find Wells and Gray actively conspired during the relevant time period. In rejecting the bifurcation argument in its order denying judgment of acquittal, the trial court concluded:

> Gray initially was quite involved in the proposed activities. While he subsequently indicated at one point that he was not "playing," at least at that particular time, he still participated in discussions with [Wells] concerning the location of the proposed transactions, how to prevent Joker from being compromised, and other aspects of the activities that a jury could find to constitute active participation in planning.

District Ct. Order of Aug. 23, 2011, Docket No. 271, at 3-4. The record bears out the district court's conclusion. On July 10, 2009, the date on which Wells asserts Gray terminated Gray's independent conspiracy with Joker, Gray informed Wells he had promised to intercede on Joker's behalf should he get "hung up." That same day, Wells allayed Joker's fear he had somehow angered Gray by telling Joker "[Gray] and I don't work that way." Three days later, Gray called Wells to discuss Joker's visit to Tulsa; they agreed they would not interfere, resulting in "[b]usiness as usual for [Joker]." More than two weeks later, Wells and Gray spoke twice—the first call initiated by Wells and the second call by Gray. They discussed the fact Joker had brought two pounds of methamphetamine to Tulsa

-30-

and considered how best to arrest Joker's buyer without hurting Joker.

Furthermore, during the midst of the Cherokee Inn Casino sting, Joker called

Gray and left a voicemail indicating it was important that Joker speak to Wells.

Shortly thereafter, Wells called Joker. All this demonstrates Wells and Gray

continued to cooperate as to the venture with Joker, regardless of who took the

lead in communicating with Joker. The evidence adduced at trial is sufficient to

establish a single conspiracy during the relevant time period.

### c. Interdependence

In two abbreviated paragraphs of his opening brief, Wells asserts his

conspiracy conviction must be reversed because there is insufficient evidence he

and Gray were interdependent. That is, Wells asserts the testimony at trial failed

to prove he and Gray "intended to act together for their shared mutual benefit."

*United States v. Hamilton*, 587 F.3d 1199, 1208 (10th Cir. 2009) (quotation and

alteration omitted).[24] In support of this argument, Wells asserts nothing in the

---

[24]For the first time in his reply brief, Wells asserts the district court erred in reviewing his motion for judgment of acquittal because it analyzed whether there was evidence of criminal facilitation, rather than whether there was evidence Wells and Gray intended to act for their shared mutual benefit. Wells further argues the government's arguments on appeal are subject to the same legal error. The problems with Wells's arguments in this regard are almost too numerous to count. First, Wells's argument is utterly inconsistent with the argument he made in his motion for judgment of acquittal. In that motion, he specifically argued as follows: "Any conspiracy must have interdependence. A defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole." Mot. for Acquittal, filed June 21, 2011,

(continued...)

-31-

record indicates either he or Gray "intended to benefit personally in any way by their relationship with Joker." Appellant's Opening Br. at 53.

The problem with Wells's argument is that it consistently fails to view the record evidence, and the reasonable inferences therefrom, in the light most favorable to the jury's verdict. *Rufai*, 732 F.3d at 1188. As set out above, there is ample record evidence Wells and Gray facilitated the sale of drugs by Joker. They told Joker how to avoid detection, permitted him to recoup expenses and profits from sales, intervened to prevent his capture by a fellow police officer, and stood by while he purportedly sold two pounds of methamphetamine. Furthermore, the record contains sufficient evidence from which a jury could infer that Wells's and Gray's reasons for doing so were to establish additional opportunities to steal drugs and money from large-scale drug traffickers. This being the case, the record contains sufficient evidence both that Wells and Gray

---

[24](...continued)
Docket No. 253, at 9 (citation omitted). That is, his arguments as to the alleged insufficiency of the evidence centered exclusively on the question of criminal facilitation. Thus, if there were any error in this case, it appears to have been invited by Wells. In any event, and putting aside other problems with Wells's failure to raise this issue in a timely fashion, this court's precedents make clear the district court was correct to take up the question of "criminal facilitation" as part of a requested review of the sufficiency of the evidence. *United States v. Hamilton*, 587 F.3d 1199, 1208-09 (10th Cir. 2009) ("[Interdependence] requires proof that the conspirators intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged. The requirement is satisfied if the alleged coconspirators were united in a common unlawful goal or purpose and if a defendant's activities facilitated the endeavors of *another alleged coconspirator or facilitated the venture as a whole*." (quotations and citation omitted)).

intended to act together for their shared mutual benefit and they actively

facilitated Joker's drug distribution enterprise in an attempt to achieve that

purpose. Thus, the record evidence in this case is clearly sufficient to support the

jury's finding that Wells and Gray were interdependent.

## C. Key Fob Evidence

Wells asserts the district court erred when it refused to admit at trial

recordings from the key fob possessed by Joker at the initiation of the sting

operation.[25] In particular, Wells asserts it was necessary to admit the key fob

recordings to disprove testimony from McDoulett and FBI Agent Matt Lotspeich[26]

---

[25]The government argues convincingly that Wells did not preserve this issue
in the district court with a specific objection. *See United States v. Renteria*, 720
F.3d 1245, 1255 (10th Cir. 2013) ("Because [the appellant] made no specific
objection below, we review this argument for plain error."). In particular, issues
surrounding the key fob were litigated exclusively by Wells's codefendants, on
the basis that the key fob recordings portrayed the actions of the codefendants in
a potentially positive light. The key fob was actually in the possession of both of
Wells's codefendants, but there is no indication in the record it was ever in
Wells's possession. Even after the government raised this preservation argument
in its response brief, Wells's reply brief fails to identify a district court objection
specifically explaining the necessity of admitting the key fob recordings to
explain or make complete other evidence *relevant to Wells* adduced by the
government. *See United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir
2010) (setting out test for admissibility under rule of completeness). In the end,
however, it is unnecessary to engage in a lengthy analysis of this procedural
question because Wells cannot show the district court erred under the normally
applicable abuse-of-discretion standard. *United States v. Phillips*, 543 F.3d 1197,
1203 (10th Cir. 2008).

[26]Lotspeich testified he participated in the sting operation at the Super 8
Motel. Lotspeich was part of a surveillance team located in a hotel room across
the parking lot from the motel. Lotspeich provided the foundation necessary to

(continued...)

that Gray and Wells discussed with Joker a profit sharing agreement. *See supra* Section III.B.2.a (setting out McDoulett's testimony as to this point).[27] We conclude the district court did not abuse its discretion in refusing to admit the key fob recordings.

At trial, the defendants contended there were suspect gaps in the recordings from the floor lamp and clock radio. In an effort to fill those gaps,[28] the defendants sought to admit recordings from the key fob. The government opposed the defendants' requests on the ground the key fob recordings amounted

---

[26](...continued)
admit the electronic surveillance evidence from the floor lamp and clock radio.

[27]In his reply brief, Wells identifies numerous additional misleading impressions he contends were created by the oral testimony of the government's witnesses and the electronic surveillance the government adduced at trial. Because these issues were raised for the first time in Wells's reply brief, we do not consider them. *SEC v. Thompson*, 732 F.3d 1151, 1169 n.16 (10th Cir. 2013).

[28]There is no question the floor lamp and clock radio failed to record all events in Joker's motel room. Likewise, there are gaps in the recording on the key fob. Both before and during trial, the defendants contended the gaps were either the result of government manipulation or the process of minimization. *Cf. United States v. Yarbrough*, 527 F.3d 1092, 1097 (10th Cir. 2008) (describing the process of minimization). The government, on the other hand, argued the gaps in the floor lamp and clock radio recordings were caused by the physical manipulation of those items during the search of the motel room and the gaps in the key fob recording were the result of officers depressing the buttons on the fob while they were trying to identify Joker's car. The district court concluded the presence of those gaps went to the issue of the weight of the evidence, not its admissibility. *See United States v. Oslund*, 453 F.3d 1048, 1055-56 (8th Cir. 2006) (so holding). Wells does not challenge this ruling on appeal. Instead, he argues that having admitted the floor lamp and clock radio recordings, the rule of completeness compelled the admission of the key fob recordings. Thus, we limit our consideration to that narrow issue.

to unreliable hearsay. In particular, the government noted that unlike the other recording devices, the key fob recorder was controlled exclusively by the user. Furthermore, immediately upon his detention by Hill, the key fob was taken away from Joker and not returned to him until the end of his encounter with the Tulsa Police Department officers at the Super 8 Motel. In the interim, the key fob was passed around to several different officers, some of whom drove around the area adjacent to the Super 8 Motel depressing the buttons on the fob in an effort to locate Joker's vehicle. For that reason, the government argued that neither McDoulett nor any other government agent could provide a necessary foundation for the accuracy of the recordings on the key fob. The district court agreed, concluding that if the defendants wanted to adduce the key fob recordings, they would have to adduce witnesses to provide the necessary foundation. Wells asserts on appeal that the rule of completeness, Fed. R. Evid. 106, overcomes any hearsay concerns with the key fob recordings and, thus, the district court erred in refusing to admit them.[29]

---

[29]This court has very serious doubts as to whether the rule of completeness operates in the all-encompassing way advocated by Wells. Wells suggests the rule of completeness allows him to adduce hearsay recordings to call into doubt oral testimony from a witness, even when the witness's testimony is not based in any way on that recording. In support of this assertion, Wells cites to the following passage from *Lopez-Medina*: "While Rule 106 applies only to writings and recorded statements, we have held the rule of completeness embodied in Rule 106 is substantially applicable to oral testimony as well by virtue of Fed. R. Evid. 611(a), which obligates the court to make the interrogation and presentation

(continued...)

In determining whether a disputed piece of evidence must be admitted under the rule of completeness, this court considers "whether (1) it explains the admitted evidence, (2) places the admitted evidence in context, (3) avoids misleading the jury, and (4) insures fair and impartial understanding of the evidence." *United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010) (quotations omitted). None of the recorded episodes on the key fob explain or place in context McDoulett's or Lotspeich's testimony as to the nature of the deal Wells and Gray tried to strike with McDoulett's Joker persona. McDoulett testified that after he was detained by Hill and gave consent to Wells to search the motel room, he sat in Hill's patrol car for approximately fifteen minutes. He was then returned to the motel room and questioned by Wells and Gray. In particular, he testified that at this point they discussed the profit sharing arrangement with

---

[29](...continued)
effective for the ascertainment of truth." 596 F.3d at 734 (quotations omitted). Wells's arguments take this language out of context. At issue in *Lopez-Medina* was whether a coconspirator's fact allocution at a plea hearing was admissible under the rule of completeness when that coconspirator's guilty plea from that same hearing had already been admitted. *Id*. at 732-35. That is, are all parts of an oral plea admissible to provide context to a simple plea of guilty? Thus, *Lopez-Medina* did not involve unrelated hearsay used to impeach oral testimony; instead, it involved the use of contemporaneous fact allocution to explain and give context to testimony that an individual had pleaded guilty to a crime. *Id.* at 735 (holding individual's fact allocution could come in to provide context when defendant argued that individual's guilty plea demonstrated the individual accepted sole responsibility for the crime). Nevertheless, as with questions about the proper standard of review, this court need not define the breadth of the rule of completeness because Wells cannot prevail even under the incredibly broad reading he advocates.

him outside the presence of any other officer and well before an officer with the key fob returned to the room much later in the evening. The record makes absolutely clear the key fob was not in the room during this time period.[30] Thus, in contrast to Wells's contentions, the absence of any such discussion in the recordings captured on the key fob does not bear on or relate to McDoulett's or Lotspeich's testimony in any meaningful way. Because the rule of completeness is not implicated by McDoulett's and Lotspeich's testimony, the district court did not abuse its discretion in refusing to admit the hearsay recordings contained on the key fob.

## D. Mistrial Motion

### 1. Background

At trial, Eric Hill testified under a grant of immunity about his involvement in criminal activity while employed by the Tulsa Police Department. Among other acts of corruption, Hill testified he was involved with Wells, Gray, and others in stealing money found during the search of a drug dealer's house. Hill also was present during the sting at the Super 8 Motel. He testified about the events at the sting and about a meeting afterward at a local restaurant attended by

---

[30]In fact, the record reveals the key fob was not brought back into Joker's presence until after the officers had discovered a federal agent in the vicinity of Joker's room and began to question whether they were the subjects of a federal sting. Thus, it is not surprising those later discussions (i.e., those actually captured on the key fob) would not contain an explicit reiteration of a profit sharing proposal by Gray and Wells.

Wells and others.  A primary topic of discussion was whether the incident was a federal sting operation and, because of that possibility, the need to make sure all the money found during the search was turned into the Tulsa Police Department property room.

Hill also testified about a discussion with Wells at Wells's retirement party, which occurred after the federal investigation became widely known.  They talked about the money they had stolen while conducting the search at the drug dealer's house, Gray's cooperation with the FBI, and other criminal acts committed by the officers.  When the prosecutor asked Hill why he and Wells were talking about these matters, Hill responded as follows: "It was all brought up in—you know, at that time, I don't know if he had a deal or a deal was perceived to be offered as far as, you know, his number[] was a six-year probation."  Wells objected, stating the prosecution was getting into a plea offer and moved for, *inter alia*, a mistrial.  The district court denied Wells's motion for a mistrial, specifically noting the government immediately attempted to change the subject when Hill started speaking about a plea offer.  The district court did, however, give the jury the following cautionary instruction: "Ladies and gentlemen, disregard that last answer.  I'll strike it from the record. We're getting into an area that's not proper for jury consideration."

## 2. Standard of Review

Wells argues the district court erred in denying his motion for a mistrial. According to Wells, Hill's statement about the possibility of a plea agreement was so damning it was impossible for the jury to follow the district court's cautionary instruction and place the matter out of its consideration. "A trial court may appropriately grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired . . . ." *United States v. Cavely*, 318 F.3d 987, 997 (10th Cir. 2003) (quotation omitted). This calculus calls for "an examination of the prejudicial impact of an error . . . viewed in the context of an entire case." *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004) (quotation omitted) (setting out three-part test for evaluating claims that although not styled as ones of prosecutorial conduct, involve "the prosecutor ask[ing] a question her witness answered in a potentially improper way").[31] While there are "cases where the prejudicial effect cannot be erased because the evidence is of such a nature that it necessarily interferes with the jury's impartial consideration of other evidence," "[t]he general rule is that the effect of improper evidence may be remedied by admonishing the jury to disregard and by withdrawing the evidence."

[31]The three-part *Meridyth* test considers the following: "(1) whether the prosecutor acted in bad faith, (2) whether the district court limited the effect of the improper statement through its instructions to the jury, and (3) whether the improper remark was inconsequential in light of the other evidence of the defendant's guilt." *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004).

*United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir. 1980). Whether to grant a mistrial under this standard is within the sound discretion of the district court. *Meridyth*, 364 F.3d at 1183. Thus, this court will reverse only if it has a "definite and firm conviction that the lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Chanthadara*, 230 F.3d 1237, 1248 (10th Cir. 2000) (quotation omitted).

### 3. Analysis

The district court did not abuse its discretion in denying Wells's request for a mistrial. First, the record contains no indication the prosecutor intentionally elicited from Hill testimony regarding the possibility Wells had entered into plea negotiations with the government. *See Meridyth*, 364 F.3d at 1183. That is, the prosecutor's line of questions does not appear to have been designed to elicit an improper response. Furthermore, as noted by the district court, the prosecutor attempted to change the subject immediately after Hill referenced Wells's plea negotiations. Second, the district court "limited the effect of the improper statement through its instructions to the jury." *Id.* "[J]uries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quotation omitted). An erroneous admission of evidence, like that at issue here, "may generally be cured by withdrawing the evidence and instructing the jury to disregard it." *United States v. Williams*, 923 F.2d 1397, 1401 (10th Cir. 1990). The curative instruction employed by the district court in this case deserves

special consideration because it was "clear and concise and pertained to testimonial evidence from a single witness that was amenable to easy segregation in the minds of the jury." *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002). Finally, a review of the record demonstrates Hill's brief statement about the possibility Wells had entered into a plea agreement "was inconsequential in light of the other evidence of [Wells's] guilt." *Meridyth*, 364 F.3d at 1183. As set out at some length above, the evidence supporting Wells's convictions was exceedingly strong. All this being the case, there is no reason to believe the jury could not follow its instruction to disregard Hill's remark.[32] The district court, therefore, acted well within its discretion when it refused to grant a mistrial and instead relied on a curative instruction.

## IV. CONCLUSION

For those reasons set out above, the judgment of conviction entered by the United States District Court for the Northern District of Oklahoma is hereby **AFFIRMED**.

---

[32]Our conclusion in this regard is strongly buttressed by the conduct of the jury in this case. As Wells recognizes, the jury acquitted him of many of the charges leveled against him. This demonstrates the jury undertook its duty seriously and dispassionately, examining each count in the indictment carefully to see if the government had carried its burden of proving Wells's guilt beyond a reasonable doubt. If, as Wells argues, the information about his plea so influenced the jury, one would surely expect the jury to convict him on all counts.